**RINGSTREET NORTHCREST, INC., Appellant,**

v.

**Robert BISANZ, et al., Respondent.**

**No. WD 49369.**

Missouri Court of Appeals, Western District.

Jan. 10, 1995.

William M. Modrcin, Jr., Kansas City, for appellant.

John M. McFarland, Kansas City, for respondent.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

FENNER, Chief Judge.

Appellant, Ringstreet Northcrest, Inc. (Ringstreet), appeals the order of the Circuit Court of Platte County, Missouri, granting summary judgment in favor of respondents Real Estate Equities Investment Fund–1981 and Robert Bisanz and Terrance Troy, general partners of Real Estate Equities (hereinafter collectively referred to as Respondents).

The cause of action involves a real estate contract entered into between Respondents and Ringstreet.[1] The contract was for the sale of a 153–unit apartment complex known as the Northcrest Apartments (the Property) located in Platte County. Ringstreet purchased the Property from Respondents on March 31, 1988. In the winter of 1989, the pipes in the apartment complex froze and burst causing extensive damage throughout the apartment complex.

## I. RINGSTREET'S PETITION

On September 17, 1990, Ringstreet filed a First Amended Petition in the Circuit Court of Platte County. In Count I of the petition, Ringstreet alleged that Respondents knew or should have known of the problem with the pipes in the apartment complex freezing on a

---

1. The real estate contract was entered into on March 22, 1988 between Real Estate Equities (seller) and Marc Vianello and Eric Vianello, principals of Ringstreet, subject to rights of assignment set forth in section 15 of the contract:

*Successors and Assigns.* This Contract shall bind the successors and assigns of the parties. Buyer shall not be permitted to assign this Contract without Seller's prior written consent, *except to a corporation or partnership of which the two Buyers and their spouses are the principal shareholders or general partners* (emphasis added).

The Vianellos assigned their interest in the contract to Ringstreet prior to closing.

regular basis in cold weather, that Respondents failed to disclose this condition prior to the sale, that Ringstreet inspected the Property prior to the sale, that the defect could not be discovered through ordinary inspection, that the defect was material to the purchase, and that Respondents' actions in failing to reveal the condition were the direct and proximate cause of Ringstreet's damages. Ringstreet alleged that it suffered in excess of $15,000 in damages.

In Count II, Ringstreet alleged that on March 31, 1988, Ringstreet gave Respondents a wrap-around note (WAN) secured by a wrap-around deed of trust (WADOT). Ringstreet alleged that the WAN and WADOT have been fully paid and all obligations fully satisfied, that Respondents failed or refused, within thirty days, to acknowledge satisfaction of the WAN and WADOT and have failed to deliver a sufficient deed of release in accordance with section 443.130, RSMo 1986.[2] Rather, Respondents only delivered a partial deed of release. Ringstreet alleged that, under section 443.130, it is entitled to 10% of the amount of the WAN and WADOT as damages.

Ringstreet filed a Revised Second Amended Petition on March 14, 1994. This revised petition was in response to Respondents' Motion for Partial Summary Judgment alleging that Ringstreet's allegations of fraud were not sufficiently pled. Ringstreet's revised petition added more specificity to the allegations of fraud. The language in the revised petition was essentially as follows: In Count I of this revised petition, Ringstreet alleged that, either prior to or at the time of the sale, Respondents *knew* that the pipes in the apartment complex froze on a regular basis in cold weather. Ringstreet further alleged that *although Respondents possessed such actual knowledge, they intentionally failed to disclose this condition to Ringstreet prior to the sale so that the transaction would go forward.* Ringstreet alleged that due to the fact that Respondents *were in a superior position and possessed material information*

*not within the fair and reasonable reach of Ringstreet, Respondents had a duty to disclose this information* to Ringstreet and failed to do so. Ringstreet allegedly *relied upon this nondisclosure* in its decision to purchase the apartment complex.

In Count II of its revised petition, Ringstreet alleged that the WAN and WADOT were fully paid and all obligations thereunder fully satisfied *on November 3, 1989 and request for a sufficient release was made on the same date.* Ringstreet further alleged that Respondents failed, or refused, within thirty days after *the November 3, 1989* request and tender of costs, to acknowledge satisfaction of the WAN and WADOT and have failed to deliver a sufficient deed of release for the WAN and WADOT.

## II. FINANCING OF REAL ESTATE TRANSACTION (Petition Count II)[3]

### A. *Background*

As part of the financing for Ringstreet's purchase of the apartment complex, the parties executed a wrap-around promissory note (WAN) and a wrap-around deed of trust (WADOT) securing the note. The WADOT secured the WAN the face amount of which ($2,083,000.00) included the then outstanding obligations owed by Respondents on three prior loans against the Property (secured by two prior deeds of trust), plus the actual loan amount ($3,945.28) that Respondents were charging or "lending" Ringstreet to purchase the Property.

The real estate contract also included a Discount Agreement that obligated Ringstreet to share with Respondents any monetary savings realized by Ringstreet if and when Ringstreet succeeded in negotiating with the senior mortgage holders, prior to maturity, a discounted payoff of two of the senior loans. This Discount Agreement, set forth in section 2.1 of the real estate contract, provides, in pertinent part, as follows:

Ringstreet's first four arguments in its brief relate to Count II and Ringstreet's last argument relates to Count I of its petition (the fraud claim).

---

2. All statutory references are to RSMo 1986 unless otherwise specifically indicated.

3. We address Count II of Ringstreet's petition (the section 443.130 claim) first merely because

The [WAN] shall require the Buyer to make monthly payments to Seller in the amount of the sum of the monthly payments due on the Underlying Mortgages. Seller shall be obligated to make the monthly payments directly to the Underlying Mortgage holders, if Buyer has made the monthly payments to Seller.... *If Buyer is able to realize any discount on the current amounts of the Underlying Mortgages, Buyer agrees to split the amount of such discount less the amount of the commission paid by Buyer pursuant to Section 16 hereof with Seller and to pay to Seller Seller's share of the same in cash at the time the discount is received by Buyer* (emphasis added).

The WADOT secured payment from Ringstreet to Respondents of Ringstreet's WAN obligations and also secured the payment of Ringstreet's Discount Agreement obligations to Respondents under the contract, as is evidenced by the following language in section 1 of the WADOT:

This [WADOT] is given as security for the performance of the covenants contained in this Deed of Trust, as security for the payment of the balance due under [the WAN], ... *and as security for [Ringstreet's] performance of its obligation to split with [Respondents] any discount on the current amounts of the Underlying Mortgages (as defined in the Real Estate Contract described below) under Section 2.1 of the Real Estate Contract between [Ringstreet] and [Respondents] dated March 22, 1988* which obligations shall survive the closing of the transaction described in the Real Estate Contract (emphasis added).

Additionally, the termination clause of the WADOT (section 13) provides, in pertinent part, as follows:

[Ringstreet] shall have the option to terminate this [WADOT] on or after January 1, 1989 by satisfying its obligations under the [WAN] described in Section 1 hereof by paying and discharging the indebtedness evidenced by the [WAN] or by assuming the outstanding obligations secured by the Senior Deeds of Trust and paying to [Respondents] the difference, if any, between the outstanding obligations under the Senior Deeds of Trust and the balance outstanding under the [WAN]. In the event [Ringstreet] assumes such obligations, [Respondents] shall promptly release this [WADOT] and return the [WAN] stamped "paid in full" to [Ringstreet].

If the [WAN] and all other debts secured by this [WADOT] are paid with interest when due, and if the agreements contained in this [WADOT] are faithfully performed, then this instrument, including the lease below set forth, shall be void, and the Property shall be released at the cost of [Ringstreet]. If, however, any event of default under this [WADOT] occurs, then the [WAN] and all other debts secured by this [WADOT] shall become due and payable at the option of [Respondents], and this [WADOT] shall remain in force.

The record reflects that on August 31, 1989, Ringstreet assumed all outstanding obligations secured by the senior deeds of trust. On November 3, 1989, Ringstreet tendered payments of $3,960.62 and $100.00 to respondents, constituting the difference between the outstanding obligations under the senior deeds of trust and the balance outstanding under the WAN, and interest thereon, and costs of recording a sufficient deed of release.

Respondents issued Ringstreet a Partial Deed of Release, dated December 21, 1989, reflecting Ringstreet's satisfaction of the WAN obligation, but indicating that the WADOT remained in force for the sole purpose of securing the payment of Ringstreet's Discount Agreement obligations to Respondents under the real estate contract. The Partial Deed of Release stated, in part, as follows:

[Ringstreet] has satisfied its obligations under the [WAN] described in Section 1 of aforementioned [WADOT] by assuming the outstanding obligations secured by the Senior Deeds of Trust and by paying the difference between the outstanding obligations under the Senior Deeds of Trust and the balance outstanding under the [WAN] to [Respondents]. Therefore, the [WADOT] is released insofar as the same stands as security for the [WAN] described therein.

[Ringstreet] is still obligated to pay to [Respondents] one-half of any discount [Ringstreet] realizes upon the prepayment or refinancing of the amounts due under the Underlying Mortgages ..., as stated in Section 1 of the [WADOT], less $10,-000.00. Such discounts are due to [Respondents] as soon as they are realized by [Ringstreet]. *The [WADOT] still secures this obligation and, to the extent and only to the extent it secures the same, the lien and effect of the [WADOT] remains in force* (emphasis added).

Ringstreet had requested that Respondents comply with the terms of the WADOT by acknowledging satisfaction of the WAN, delivering to Ringstreet the WAN marked "Paid in full" and delivering to Ringstreet a deed of release sufficient to release, in full, the encumbrance created under the WADOT. Thus, Ringstreet refused the tender of the Partial Deed of Release and alleged that once Ringstreet satisfied its WAN obligations, the WADOT terminated in its entirety and no longer secured payment to Respondents of Ringstreet's Discount Agreement obligations under the contract. Ringstreet demanded a "full" deed of release and, when Respondents failed to provide one, it brought its Count II claims, as set forth in its petition, based on section 443.130, RSMo 1986.[4]

On April 14, 1992, Ringstreet filed a Motion for Partial Summary Judgment on Count II of its petition. On June 9, 1992, the trial court overruled Ringstreet's motion.

Respondents filed a Motion for Partial Summary Judgment, on January 24, 1994, on Count II of Ringstreet's petition, alleging that, as a matter of law, the WADOT did continue to secure Ringstreet's Discount Agreement obligations to Respondents under the real estate contract after Ringstreet's satisfaction of its WAN obligations.

The trial court sustained Respondents' Motion for Partial Summary Judgment as to Count II on March 14, 1994, finding that Respondents' rights to the Discount Agreement in the WAN and WADOT remained as security for the WADOT and survived Ringstreet's satisfaction of the WAN.

### B. Ringstreet's Arguments on Appeal

Points I, II, III, and IV of Ringstreet's brief relate to Count II of its petition and section 443.130. As to this financing issue, Point IV is dispositive. In its fourth point, Ringstreet argues that the trial court erred in granting summary judgment in favor of Respondents because there were "genuine issues of material fact in that (A) the expectations and intent of the parties were in dispute, and (B) if the trial court's interpretation of the WADOT is correct, the instrument is ambiguous as between the 'termination provision' and the other provisions of the instrument." Ringstreet contends that Missouri law precludes summary judgment when there exists genuine factual disputes regarding the meaning and effect of a contract which is not clear and apparent from the language of the contract itself.[5]

We initially note the standard of review for summary judgment. Summary judgment will be upheld on appeal if we determine that the movant had a right to judgment as a matter of law and that no genuine issues of material fact existed. *Rodgers v. Czamanske*, 862 S.W.2d 453, 457 (Mo.App.1993). For purposes of Rule 74.04, a "genuine issue"

---

4. Section 443.130 provides as follows:
 If any such person, thus receiving satisfaction, do not, within thirty days after request and tender of costs, acknowledge satisfaction on the margin of the record, or deliver to the person making satisfaction a sufficient deed of release, he shall forfeit to the party aggrieved ten percent upon the amount of the mortgage or deed of trust money, absolutely, and any other damages he may be able to prove he has sustained, to be recovered in any court of competent jurisdiction.

5. It is interesting to note that in Ringstreet's first point on appeal, Ringstreet argues that the

*"plain and unambiguous language of the [WADOT]* mandated the instrument be terminated as per its specific termination provision (emphasis added)." Ringstreet further argues in its first point that the "unequivocal language" of the Termination Provision empowered Ringstreet to terminate the WADOT. In its fourth point, however, Ringstreet argues that the WADOT is "ambiguous" as between the Termination Provision and the other provisions of the WADOT and that the meaning and effect of the instrument is "not clear and apparent." These strike us as inconsistent and contradictory arguments on Ringstreet's part.

exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 382 (Mo. banc 1993). A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous. *Id.* Where the "genuine issues" raised by the non-movant are merely argumentative, imaginary or frivolous, summary judgment is proper. *Id.*

When considering an appeal from a summary judgment, we will review the record in the light most favorable to the party against whom judgment was entered. *Id.* at 376.

■■■ A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of the terms. *Jake C. Byers, Inc. v. J.B.C. Investments*, 834 S.W.2d 806, 816 (Mo.App. 1992) (citations omitted). A contract is not ambiguous merely because the parties disagree over its meaning. *Id.* To determine whether a contract is ambiguous, we consider the whole instrument and give the words in the contract their natural and ordinary meaning. *Id.* Whether a contract is ambiguous is a question of law. *Id.*

■■■ The terms of the contract are read as a whole to arrive at the intention of the parties. *Village of Cairo v. Bodine Contracting Co.*, 685 S.W.2d 253, 264 (Mo.App.1985). In that exercise, each term is construed to avoid an effect which renders other terms meaningless. *Id.* A construction which attributes a reasonable meaning to all the provisions of the agreement is preferred to one which leaves some of the provisions without function or sense. *Id.*

■■■ Several instruments made at the same time and relating to the same subject matter may be read together as one contract, and recitals in one may be explained by reference to the other. *Merz v. First Nat'l Bank*, 682 S.W.2d 500, 502 (Mo.App.1984). In the case at bar, the real estate contract was executed in conjunction with the WAN and the WADOT which instruments set forth the financing arrangement for the purchase of the Property. Thus, we read the instru-

ments together to determine the substantive merit of Ringstreet's argument.

■■■ Section 2.1 of the real estate contract sets forth the Discount Agreement, which reads, in pertinent part, as follows:

> If [Ringstreet] is able to realize any discount on the current amounts of the Underlying Mortgages, [Ringstreet] agrees to split the amount of such discount less the amount of the commission paid by [Ringstreet] pursuant to Section 16 hereof with [Respondents] and to pay to [Respondents] [Respondents'] share of the same in cash at the time the discount is received by [Ringstreet].

Section 1 of the WADOT provides, in pertinent part, as follows:

> This [WADOT] is given as security for the performance of the covenants contained in this [WADOT], as security for the payment of the balance due under a [WAN] dated this same date ... *and as security for [Ringstreet's] performance of its obligation to split with [Respondents] any discount on the current amounts of the Underlying Mortgages (as defined in the Real Estate Contract described below) under Section 2.1 of the Real Estate Contract between [Ringstreet] and [Respondents] dated March 22, 1988* which obligations shall survive the closing of the transaction described in the Real Estate Contract (emphasis added).

The termination provision of the WADOT (section 13) provides as follows:

> [Ringstreet] shall have the option *to terminate this [WADOT] on or after January 1, 1989 by satisfying its obligations under the [WAN] described in Section 1 hereof by paying and discharging the indebtedness evidenced by the [WAN] or by assuming the outstanding obligations secured by the Senior Deeds of Trust and the balance outstanding under the [WAN]. In the event [Ringstreet] assumes such obligations, [Respondents] shall promptly release this [WADOT] and return the [WAN] stamped "paid in full" to [Ringstreet].*

> If the [WAN] and all other debts secured by this [WADOT] are paid with in-

terest when due, and if the agreements contained in this [WADOT] are faithfully performed, then this instrument, including the lease below set forth, shall be void, and the Property shall be released at the cost of [Ringstreet]. If, however, any event of default under this [WADOT] occurs, then the [WAN] and all other debts secured by this [WADOT] shall become due and payable at the option of [Respondents], and this [WADOT] shall remain in force (emphasis added).

We find that, in reading the relevant provisions of the real estate contract and the WADOT together, the language is ambiguous. The language could be interpreted to mean that the WADOT is given as security for Ringstreet's satisfaction of its WAN obligation *and* for Ringstreet's satisfaction of its obligation under the Discount Agreement. The termination provision together with section 1 of the WADOT could arguably be read to mean that the WADOT does not terminate merely upon Ringstreet's satisfaction of its WAN obligation, but also requires Ringstreet's satisfaction of the Discount Agreement.

On the other hand, the termination provision of the WADOT (section 13) could be interpreted to mean that the WADOT terminates once Ringstreet has assumed the obligations secured by the senior deeds of trust and the balance outstanding under the WAN, as Ringstreet did in the case at bar. According to section 13, "[i]n the event [Ringstreet] assumes such obligations, [Respondents] shall promptly release this [WADOT] and return the [WAN] stamped 'paid in full' to [Ringstreet]."

The terms of the contract are susceptible of more than one meaning. Because there was a disputed material fact regarding the meaning and effect of the termination provision, summary judgment was inappropriate. The trial court erred in granting summary judgment in favor of Respondents on this issue. We reverse and remand for trial.

## III. RESPONDENTS' ALLEGED FRAUD (Petition Count I)

### A. *Background*

In the winter of 1989, the pipes in the apartment complex that Ringstreet had purchased from Respondents froze and burst causing extensive damage throughout the apartment complex.

As stated above, in Count I of its Revised Second Amended Petition, Ringstreet alleged that, either prior to or at the time of the sale, Respondents knew that the pipes in the apartment complex froze on a regular basis in cold weather. Ringstreet further alleged that although Respondents possessed such actual knowledge, they intentionally failed to disclose this condition to Ringstreet prior to the sale so that the transaction would go forward. Ringstreet alleged that due to the fact that Respondents were in a superior position and possessed material information not within the fair and reasonable reach of Ringstreet, Respondents had a duty to disclose this information to Ringstreet and failed to do so. Ringstreet allegedly relied upon this nondisclosure in its decision to purchase the apartment complex.

On January 5, 1994, Respondents had filed a Motion for Partial Summary Judgment on Count I of Ringstreet's First Amended Petition. In their motion, Respondents alleged that Ringstreet's fraud allegations were not sufficiently pled, and thus, failed to state a claim upon which relief can be granted (Ringstreet, in response, amended its petition to set forth the issues in controversy "more fully"). Respondents further alleged that, even if Ringstreet's petition were not deficient, as a matter of law, Ringstreet will be unable to present proof on at least three of the essential elements of its fraudulent nondisclosure claim on which it bears the burden of proof. Specifically, respondents argued that the pertinent provisions of the real estate contract establish that, as a matter of law, Ringstreet could not have relied upon, and had no right to rely upon, any silence of Respondents in relation to the physical condition of any portion of the Property, including plumbing and ventilation systems, fixtures and equipment, in making its purchase determination.

Respondents further contended in their motion that Ringstreet and Respondents had contractually agreed, in March of 1988, that

Respondents were not obligated to make, and had not made, any warranties, representations or statements concerning the physical condition of the Property. Respondents argued that "[h]aving materially induced [Respondents] into selling it the Apartments by contractually agreeing that [Respondents] would not have to make any representations concerning the physical condition of the Apartments, [Ringstreet] is disingenuous in now claiming that [Respondents'] lawful exercise of that right was fraudulent or breached a duty owing to [Ringstreet]."

Finally, Respondents argued that it would be disingenuous for Ringstreet to aver that Respondents intended that Ringstreet act on the alleged nondisclosure, as it was Ringstreet who had accorded Respondents the right to make no representations as an inducement to Respondents to sell Ringstreet the Property. Thus, Respondents argued that they are entitled to entry of summary judgment in their favor on Count I of Ringstreet's petition.

On March 14, 1994, the trial court sustained Respondents' Motion for Summary Judgment on Count I of Ringstreet's petition.

### B. *Ringstreet's Argument on Appeal*

On appeal, Ringstreet argues that the trial court erred in granting summary judgment in favor of Respondents and against Ringstreet on its fraud claim by determining the "as is" provision of the contract negated all duty on the part of Respondents to disclose material information not within the fair and reasonable reach of Ringstreet. Ringstreet contends that under Missouri law, a contractual provision provides no defense to a claim of fraud.

We initially note that Respondents correctly point out in their brief that Respondents' summary judgment motion as to Count I was not based solely upon the "as is" provision in the contract. Rather, Respondents refer to several provisions in the contract (apart from the "as is" provision) to support their argument that they are entitled to summary judgment in their favor. In their argument, Respondents refer to the "pertinent provisions" in the contract, focusing mainly on provisions

in section 10 of the contract, but nowhere do they specifically mention the "as is" provision. Thus, Ringstreet's focus on the "as is" provision is somewhat misplaced. In their brief, Respondents argue that the "as is" clause has no direct relevance to their arguments for summary judgment or the trial court's sustaining of their motion. We agree, and we find that, given the particular circumstances herein and the specific provisions in the real estate contract entered into between the parties, Respondents had no duty to disclose the pipe freezing problem and summary judgment was appropriate.

 The elements of a submissible case of fraud are: (1) a false material representation; (2) the speaker's knowledge of its falsity or his ignorance of its truth; (3) the speaker's intent that it should be acted upon by the hearer in the manner reasonably contemplated; (4) the hearer's ignorance of the falsity of the statement; (5) the hearer's reliance on its truth, and the right to rely thereon; and (6) proximate injury. *Mobley v. Copeland,* 828 S.W.2d 717, 724 (Mo.App. 1992). Silence can add up to misrepresentation if the silent party has a duty to speak. *Id.* at 724 n. 6.

 A duty to disclose information exists where a classical fiduciary relationship exists or where one party has superior knowledge which is not within the fair and reasonable reach of the other party. *Blaine v. J.E. Jones Constr. Co.,* 841 S.W.2d 703, 705 (Mo.App.1992). In these situations, where the duty to disclose exists, a party's failure to disclose the information serves as a substitute for the false representation element required in fraud. *Id.* Whether or not a duty to disclose exists and whether or not the circumstances amount to fraud must be determined on the facts of the particular case. *Mobley,* 828 S.W.2d at 724 n. 6 (citation omitted).

In the case at bar, there are no allegations of affirmative misrepresentations, rather the allegations concern passive nondisclosure. In other words, the case at bar is not about an affirmative misrepresentation made to Ringstreet to induce Ringstreet to purchase the Property; rather, the fraud allegations in

this case concern passive nondisclosure, or silence, on Respondents' part with regard to the plumbing on the Property.

In *Blaine v. J.E. Jones Constr. Co.*, 841 S.W.2d 703, 704 (Mo.App.1992), a case to which Ringstreet cites in its brief, plaintiffs sued defendant (Jones Construction Company) for fraud, alleging that they were induced into purchasing their homes by defendant's fraudulent concealment of its intent to build an apartment complex in the subdivision near their homes. The issue in *Blaine* was whether defendant, the vendor, had a duty to disclose to plaintiffs, the purchasers, its alleged plan to build apartments which allegedly affected the market value of plaintiffs' homes at the time the homes were purchased. *Id.* at 706. Plaintiffs contended that defendant owed them a duty to disclose its intent to build an apartment complex in their subdivision near their homes. *Id.* Defendant's failure to disclose the plan, plaintiffs argued, constituted "fraudulent concealment." *Id.* The *Blaine* court found that defendant did not have a duty to disclose. *Id.*

In discussing defendant's duty to disclose, the *Blaine* court stated as follows:

The formula developed by our courts to determine when to impose a duty to disclose on the seller in the marketplace is a not surprising formula that weighs significant factors. The formula is designed to set an operable standard of fair conduct in the marketplace. The list of factors is open-ended. Our courts, however, emphasize *the relative intelligence of the parties to the transaction, the relation the parties bear to each other, the nature of the fact not disclosed, the nature of the contract, whether the concealer is a buyer or seller, the importance of the fact not disclosed and the respective knowledge and means of acquiring knowledge of the parties....* These factors are articulated as separate factors for analytical purposes; in fact, they are interrelated and overlap.

*Id.* at 707 (emphasis added).

Respondents in the case at bar correctly point out that *Blaine* is distinguishable from the case at bar in that *Blaine* does not involve any assertion of a contract clause as a defense to a claim of passive nondisclosure

amounting to fraud. Furthermore, *Blaine* does not address whether a specific contract provision bargained for by a seller might negate a seller's duty to disclose defects and/or a buyer's right to rely on a seller's silence as a form of constructive representation of the absence of defects.

■ The relevant provisions of the real estate contract between Ringstreet and Respondents are sections 1, 6, 9, and 10. Section 1 provides, in relevant part:

*Property.* Subject to the terms and provisions of this Contract, Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, all of the following described property:

\* \* \* \* \* \*

(b) the 153–unit apartment complex known as the Northcrest Apartments, and all other buildings, structures and improvements on the land (the "Improvements"), and including without limitation, all mechanical systems, fixtures and equipment (including, but not limited to, compressors, engines and boilers); electrical systems, fixtures and equipment; heating, air conditioning and ventilation systems, fixtures and equipment, and plumbing systems, fixtures and equipment owned by Seller;

\* \* \* \* \* \*

All of the above is hereinafter collectively the "Property".

Section 6 of the contract provides as follows:

*Inspection and Cancellation Rights of Buyer; Financing Contingency.* Seller has allowed Buyer and its authorized agents access to the Property and the business office at the Property *for the purpose of inspecting all mechanical and structural components of the Property, as well as all leases, service contracts, financial reports, and other legal or financial information available at the business office at the Property.* Buyer agrees to conduct the inspections so as to cause a minimum of disruption to the operation of the Property and a minimum of inconvenience for the tenants in the Property. Buyer shall con-

duct the inspections in such manner as to preserve good business relations between Seller and the tenants of the Property. Buyer agrees to defend and indemnify Seller against any and all claims, assertions, lawsuits, costs, expenses, and liabilities which may arise as a result of Buyer's performance of the inspections. *By execution of this Contract Buyer acknowledges that it has performed all such inspections and that the results thereof are satisfactory to Buyer* (emphasis added).

Section 9 of the contract sets forth representations and warranties made by Respondents to Ringstreet. The only specific warranties listed which are even arguably relevant to the issue presented in the case at bar are as follows:

9.1 All of the records material and pertinent to the operation of the Property contained at the business office of the Property are true and accurate and correctly set forth the facts as explained therein.

9.5. Seller has not received any written notice or request from any insurance company requesting or recommending the performance of any work with respect to the Property with which Seller has not fully complied. In the event that Seller receives any such notice between the date of execution of this Contract and the closing date, Seller shall advise Buyer of the same.

9.7. Seller has not received any written notice from any governmental agency that the Property and its present use or condition violate any provision of any applicable building code, fire regulations or governmental ordinances, law or regulations. In the event that Seller receives any such notice between the date of this Contract and the closing date, Seller will advise Buyer of the same.

Section 10 of the contract provides, in pertinent part, as follows:

*Condition of Property.* The parties recognize and agree that Buyer will have ample opportunity to examine all financial and legal documents, records, files and information and all physical items and conditions relating to the Property. *Except as may be specifically set forth herein, Seller makes no warranties, representations or statements about any such matters.* No agents, employees, brokers or other persons are authorized to make any representations or warranties for Seller. *By its execution of this Contract, Buyer acknowledges that Seller has made no warranties, representations or statements other than those set forth herein [in section 9] ... concerning any condition or matter relating to the Property, including such matters as the ... availability or cost of utilities, or physical condition of the Property or any improvements thereon. Seller has relied upon this acknowledgment as a material inducement to enter into this Contract.* Buyer is hereby purchasing the Property "as is" and "where is," *and agrees that it relies upon no warranties, representations or statements by Seller or any other persons for Seller in entering into this Contract or in closing the transaction described herein, other than those warranties which are specifically set forth in this Contract [at section 9]* (emphasis added).

In their brief, Respondents argue that through the provisions of section 10 of the contract (i.e., apart from the "as is" provision), Ringstreet "explicitly and specifically relinquished its right to obtain from Respondents *any* statements concerning the physical condition of the Property's plumbing systems, fixtures and equipment." Respondents contend that this specific provision relieved them from any duty to make any statements or disclosures of any type concerning the Property's plumbing. Furthermore, because of this lack of duty on Respondents' part, Ringstreet had no right to rely on Respondents' silence as an implicit representation that no defects existed in the plumbing. Respondents contend that, as a consequence of the foregoing, Respondents clearly established their right to entry of summary judgment in their favor and against Ringstreet.

Marc Vianello, president of Ringstreet, testified in a deposition dated January 14, 1994 that, in inspecting the Property prior to purchase, Ringstreet made inquiries of people at the Property, looked at records that were available, had conversations with Terry Troy, a partner of Real Estate Equities, and

brought in an expert where necessary to state an opinion and give a cost estimate. Mr. Vianello testified that he asked at the time Ringstreet did its inspection whether the Property had had any problems with pipes freezing and bursting in the apartments. Mr. Vianello testified that Ringstreet was told that "there had been one instance." He further stated:

> With that type of response, one would undertake a particular course of action which would not be one of great concern. If on the other hand we were told that there was a repeated history of pipes freezing and bursting and apartments being flooded, we would have undertaken additional steps and had the opportunity then to make an informed decision about buying the property.
>
> \* \* \* \* \* \*
>
> My statement is that I have been informed through two sources that there were significant problems with pipes freezing and bursting at Northcrest prior to our purchase, and that we did not know that at the time of our purchase nor were we informed of that prior to the purchase.

Edward "Trip" Frizell, III, attorney for Ringstreet at the time of the purchase of the apartment complex, testified by deposition on February 10, 1994. Mr. Frizell testified that he represented Marc Vianello in connection with the review of the real estate contract and the other items that would be involved in connection with the purchase of the Property.

The following excerpts from Mr. Frizell's deposition are relevant to the issue here:

> Q. Did you advise Mr. Vianello of your concern about the fact that in the real estate contract for sale, you can correct me if I'm wrong, if I misstate your previous testimony or the documents, but that the seller was not going to make any warranties, representations, or statements as to the physical condition of the property?
>
> A. I'm sure I would have advised Mr. Vianello that that is not the preferable way to purchase a building. As a buyer you would always like to have as many representations and warranties concerning the physical condition of the property as you can possibly get from the seller.
>
> But in the real estate marketplace, it is not uncommon, given the bargaining positions of the respective parties, that sometimes the sellers are unwilling to provide representations concerning the physical condition.
>
> \* \* \* \* \* \*
>
> Q. Have you previously handled an "as is" sale when there's been a provision that, as in this case, the seller makes no warranties, representations, or statements as to the physical condition of the property?
>
> A. Yes.
>
> Q. Okay. Would your advice to a prospective buyer change based upon those additional provisions in a real estate contract for sale?
>
> A. I think it is advisable to check on the physical condition of the property regardless of whether or not there is a representation of warranty [sic] on the physical property. Obviously, a buyer would rather, if there are going to be problems, find out about those beforehand than have to rely on a lawsuit against the sellers for breach of a representation or warranty, so that should be done regardless anytime.
>
> \* \* \* \* \* \*
>
> Q. Irrespective of whether it makes common sense in either context, is there a heightened form of scrutiny that you would recommend to a client who is purchasing any property to start with that when you know that they're buying the contract "as is" with no representations, warranties, or statements from the seller as to the physical condition of the property?
>
> A. Yes.
>
> Q. What heightened form of scrutiny would you recommend in that instance?
>
> A. I think there's probably normally more concern on the buyer's standpoint, because they know that the sellers are unwilling to stand by their representations and warranty concerning physical condition.
>
> Knowing that and knowing they will not have that to fall back on if a concern or a

problem is found, then you have, you know, the opportunity only prior to the actual purchase of the property in order to try to discover those things that are discoverable.

\* \* \* \* \* \*

A. And I think that the buyer should ask the seller to disclose to them any information they may have concerning the physical condition.

\* \* \* \* \* . \*

Q. I'm going to hand you what has been marked as again Exhibit 8, which is the final executed real estate contract for sale. I direct your attention to, I think the last couple sentences of paragraph 10.

Would you agree with me that in the real estate contract for sale, at least as far as your understanding of it, that the Vianellos or the buyer agreed that they weren't going to rely on any statements as to physical condition of the property in connection with either the execution of the contract or the closing of the transaction?

A. Well, the contract says that they're buying it "as is" and they're not relying on any warranties, representations, or statements other than those specifically set forth in the contract, and I would say that's what they agreed to.

\* \* \* \* \* \*

Q. In this case, did you even advise the Vianellos that since they weren't able to rely on any statements or representations about the physical condition of the property that they should undertake efforts to view the plumbing?

A. I don't know that I specifically delineated the plumbing. It would have been in my normal course of operations to recommend to the Vianellos that they have someone come out and do a structural and mechanical inspection which usually includes also an inspection to the extent you can the pipes and the wiring and all that stuff, which is normal in a situation like this.

Q. Is there anything about this real estate contract for sale that would have constrained such an inspector, a qualified inspector, from, say, cutting an access panel

in the apartment or in whatever numbers—

A. May I see it, please?

Q. Sure. —in whatever numbers necessary for him to give an opinion, an informed opinion, about the plumbing status of the property. . . .

A. It appears in the contract that the only constraints placed upon buyer in the contract to that would be to the extent that that inspection would disrupt the operation or inconvenience the tenants of the property.

\* \* \* \* \* \*

Q. Okay. *Other than that constraint as you've just noted in the contract, are you aware of any other constraints that would have limited the ability of the Vianellos or their authorized inspector to examine the plumbing in the apartment complex?*

A. *Not any constraints that are set forth from the contract.*

\* \* \* \* \* \*

Q. *Independent of the contract, do you know of any constraints that were placed upon your clients when they inspected the property that would have precluded an inspector from gaining access on some basis through access panels to view plumbing behind walls?*

A. *I'm not aware of any constraints, no.*

Q. In your experience as a real estate attorney, has that type of access been asked for and granted in other transactions?

A. Yes (emphasis added).

The real estate contract clearly states that Ringstreet agrees that "it relies upon no warranties, representations or statements" by Respondents in purchasing the Property. Furthermore, Ringstreet was allowed to conduct a thorough inspection of the Property and examine documents relating to the Property. Given the particular provisions of the real estate contract here, and especially if, as the record indicates, Ringstreet was told prior to purchasing the Property that there had been one instance of pipes freezing, Ringstreet should have investigated the potential problem further. Respondents did not have

a duty to disclose the problem, and thus Ringstreet's fraud claim must fail as a matter of law.

We affirm the trial court's grant of summary judgment in favor of Respondents on Count I of Ringstreet's petition. As to Count II, we reverse the trial court's grant of summary judgment and remand for trial.

All concur.