**James P. McGILLEY, Appellant,**

v.

**Tatjana Z. McGILLEY, Respondent.**

**No. WD 52765.**

Missouri Court of Appeals,
Western District.

June 30, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 2, 1997.

Application to Transfer Denied
Oct. 21, 1997.

James T. Cook, Kansas City, for Appellant.

Anita I. Rodarte, Regina Keelan Bass, Kansas City, for Respondent.

Before LOWENSTEIN, P.J., and SPINDEN and HOWARD, JJ.

LOWENSTEIN, Judge.

James McGilley appeals from a Judgment of Decree of Dissolution of Marriage asserting trial court error in: 1) finding the antenuptial agreement signed by both parties was void and not enforceable; 2) finding the couple's second home in Arizona ("Casa II") and a Piper Jaffray investment account were marital property subject to division; 3) setting aside certain items of non-marital property to Mrs. McGilley; 4) awarding non-modifiable maintenance to Mrs. McGilley claiming the award was against the weight of the evidence.

## FACTS

James McGilley (Jim), then age 51, and Tatjana Zemcuznikov (Tatjana), then age 31, met in 1977 when she was teaching at his daughters' school. The couple began a romantic relationship, and one year later, they decided to marry on January 17, 1979.

Due to his concern for the financial security of his children, Jim suggested, just prior to this second marriage, that he and Tatjana enter into an antenuptial agreement. Tatjana selected an attorney to represent her interests in negotiating the antenuptial agreement from a list of three recommended by Jim's attorney. She met with her attorney for the first time on January 12, 1979, five days prior to the wedding. After negotiations, the agreement, originally drafted by Jim's attorney, was redrafted to incorporate Tatjana's proposed changes. Tatjana met with her attorney again on January 16th, and on the 17th, the day of the wedding, she signed the agreement.

In January 1983, Jim and his brother sold their interest in the family business, McGilley Memorial Chapels and Memorial Shields. Jim realized a profit of $1,800,000.00 for the sale. Appellant's portion of the proceeds were placed in a Shearson Lehman investment account, which was added to the pre-existing James P. McGilley, Jr., Trust. The primary beneficiaries of the trust were Jim, his children, and pursuant to the agreement,

Tatjana. The sale proceeds were transferred through several investment accounts but were always held in the trust. On the date of dissolution, the funds were held in a Piper Jaffray account (# 780–502300–330).

During the marriage, the McGilleys acquired a number of assets using funds from the James P. McGilley, Jr., Trust, including a second home in Arizona, Casa II, and its furnishings. The home was titled to the James P. McGilley, Jr., Trust. The couple spent several months each year in Arizona and the rest of the year in their Kansas City home, which Jim owned prior to the marriage. The McGilley's marriage lasted fifteen years and no children were born of the marriage. Tatjana worked as a teacher for the first few months of the marriage, but subsequently ceased her employment in order to travel with her husband.

In the dissolution proceedings, Jim sought to enforce the antenuptial agreement. The trial court declared the agreement void as vague, ambiguous, and not sufficiently definite to enable the court to give the terms exact meaning. The court then characterized and divided the marital property and awarded $1,000.00 per month in non-modifiable maintenance to Tatjana.

1. The antenuptial agreement contained the following specific provisions:
   1. Upon, from and after said marriage each of the parties hereto shall hold, own, keep, control, enjoy and possess, independently of any claim or right of the other, all of her or his own property, real and personal, legal as well as equitable, income as well as principal, of any and every kind, nature, and description whatsoever, and wheresoever situated, belonging to such party and in such party's possession or ownership at the time of such marriage, and all such property shall be and remain the sole, absolute, and separate property of each such party, free and clear of any and all rights of the other, with full power on the part of such party to sell, assign, transfer, convey, deal with, dispose of, devise and bequeath any and all of such party's property in any and every way as fully and effectually, in all respects and for all purposes, as if such party were single and unmarried.
   2. Each party does hereby waive and relinquish any and all rights he or she might otherwise have as a surviving spouse, under present statutes or under any statutes hereinafter in effect in any jurisdiction, in the property and estate of the other, whether by way of a distributive share in the event of intestacy, a right of election

## ANALYSIS

In his first point on appeal, Jim asserts the trial court erred in declaring the antenuptial agreement void. He argues the document was clear and unambiguous, and to the extent that it was not, the court had an obligation to employ the rules of construction to give effect to the parties' intent.

The primary points of the antenuptial agreement indicate the parties separate property will remain separate; both parties waive their statutory rights in the other's estate, however, Jim must convey a one-third share of his adjusted gross estate to Tatjana either by his last will and testament or by some other instrument; and both parties waive their right to maintenance, except that Jim agrees to pay $10,000.00 to Tatjana in the event of divorce to assist her in relocating her residence. Attached to the antenuptial agreement were financial disclosure statements of both parties. The agreement was signed by the parties and notarized. There is no claim on appeal that the agreement was the product of fraud or overreaching, nor is there any indication that the parties did not fully disclose their financial status and assets. The provisions of the antenuptial agreement are fully set out below.[1]

to take against a will, the right to act as an administrator or executor, dower, family, or spouse's allowances, homestead, exempt property or otherwise, and each does hereby release all rights whatsoever which he or she might hereafter otherwise acquire in the property and estate of the other by reason of the contemplated marriage between the parties.
   3. First party does hereby promise and agree to establish a trust share for the benefit of Second Party either in his last will and testament or in some other instrument effective at his death. Said trust share shall be funded with property equal in value to one-third (1/3) of his adjusted gross estate of First party as finally determined for federal estate tax purposes. The selection of property for the funding of this trust share shall be in the sole discretion of the corporate trustee designed by First Party in the instrument establishing such a trust share. Said trust share shall provide as follows:
      (a) The net income shall be paid to the Second party for her life, in installments, not less frequently than quarterly.
      (b) The principal of the trust share shall be available for the proper maintenance and support of Second Party or to maintain her in the

In a dissolution proceeding, the appellate court must affirm the trial court's decree unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares or applies the law. *McMullin v.* *McMullin,* 926 S.W.2d 108, 110 (Mo.App. 1996). The construction of contracts is a question of law. This court reviews declarations of law de novo. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). This court differs with the trial court's holding that the

standard of living to which she has been accustomed or to provide for any emergency affecting her occasioned be sickness, accident, ill health or affliction. The trustee may make such encroachments from time to time in such amounts as it may consider reasonable in its sole discretion taking into account all other means of support available to Second Party of which it has knowledge.

(c) On the death of the Second Party, any remaining principal of undistributed income shall be distributed to First Party's descendant's *per stirpes.*

4. If First Party should predecease the Second Party, Second Party will have the right to continue living in the principal residence, which they are living in at the time of First Party's death, until her death or remarriage. This right is conditioned upon the requirement that the Second Party allow such of First Party's two youngest daughters, who so desire, to live in said residence until the earlier of the completion of their education or their marriage.

5. It is understood and agreed that since each party has his or her own financial resources, and is able to support himself or herself and meet his or her needs through appropriate employment, neither party shall at any time make any claim against the other for support in the nature of separate maintenance or alimony. The preceding notwithstanding, in the event of the dissolution of their marriage First Party agrees to pay the Second Party the sum of Ten Thousand Dollars ($10,000.00) to assist her in setting up a separate household.

6. Nothing in this agreement shall be construed as a waiver or renunciation by either party of any gift, bequest or devise which may be made to him or her by the other, but this provision shall not be construed as· a promise or representation that any such additional gift, bequest or devise will be made by either party to the other.

7. First Party acknowledged that he has been fully informed by his attorney, Steven Krueger, in regard to his rights as a surviving spouse in the estate of Second Party, and in particular, that First Party would have the right of election, under Missouri law, to receive, subject to the payment of claims, not less than one-third of the estate of Second Party, if she is not survived by lineal descendants; and Second Party acknowledges that she had been fully informed by her attorney, Alan E. South in regard to her rights as a surviving spouse in the Estate of First Party, if he is survived by lineal descendants, or not less than one-half of the estate of First Party, if he is not survived by lineal descendants. First Party acknowledges that this agreement shall be a bar to his right of inheritance from Second Party and all other rights in her estate. Second Party acknowledges that this agreement shall be a bar to her right of inheritance from Second Party and all other rights in his estate.

8. From and after said marriage, in case either of the parties hereto desires from time to time to mortgage, pledge, sell or convey his or her property which is not "marital property" as that term is defined in Section 452.330.2 R.S.Mo. 1969 or any successor thereof, real or personal, or estate or any part thereof, the other will in each and every instance, join in the execution and acknowledgement of all deeds of conveyance, mortgages or other instruments of transfer as may be necessary or desirable to make the same effective, without the payment of any sum or of any other consideration of any kind whatsoever to such other party so joining therein; and further, each of the parties covenants and agrees that upon the request of the other, at any time and from time to time after said marriage, and without any compensation or remuneration whatever, to make and do all such acts and things, and to execute, acknowledge and deliver or cause to be made and done, all such acts and things, and to be executed, acknowledged, and delivered, all such further deeds, conveyances, agreements, instruments and documents as shall be reasonably required or shall be requested, to effectuate the intention of this agreement; and further each of the parties does hereby expressly consent and assent to the conveyance or transfer by the other of any of said nonmarital property, real or personal, and each of the parties does hereby acknowledge that said conveyance or transfer shall in no way be deemed a conveyance or transfer in fraud of his or her marital rights in such property.

9. All of the covenants and agreements herein contained shall extend to and be binding upon the heirs, executors, administrators and assigns of the parties hereto.

10. The contents of this agreement set forth the entire agreement between the parties hereto and there are no other understandings or other agreements of any kind or nature whatsoever between them relating to the matters and things hereinabove set forth. If any provision of the agreement is determined to be invalid, such determination shall not operate to invalidate any other provisions of this agreement.

11. This agreement, when fully executed, shall be construed under the laws of the State of Missouri.

12. If for any reason, the parties fail to carry out their present intention to marry each other, this agreement shall be void and of no force or effect.

agreement was ambiguous and so indefinite in its terms as to require its being declared void.

At trial, the burden of proof on the issue of the validity of the antenuptial agreement rests with the party seeking to invalidate the agreement. *State, ex rel. Rope v. Borron,* 762 S.W.2d 427, 430 (Mo.App.1988). As a general rule, antenuptial agreements will be upheld unless the trial court finds the agreement unconscionable. *Nedblake v. Nedblake,* 682 S.W.2d 852, 854 (Mo.App. 1984); See § 452.325(2), RSMo.1994. An agreement is unconscionable when the "inequality is so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it." *McMullin,* 926 S.W.2d at 110. Also, an agreement will not be enforced unless it is entered into "freely, fairly, knowingly, understandingly and in good faith and with full disclosure." *Id.*

It must be noted that although the issue was argued at trial, this appeal does not involve a finding of unconscionability. Rather, it involves the trial court's finding that this agreement was void due to its ambiguity and lack of definiteness. This court recognizes antenuptial agreements are unique and distinct and must be strictly construed. *Hosmer v. Hosmer,* 611 S.W.2d 32, 35 (Mo. App.1980). However, in dealing with the issue of whether the agreement was so vague as to be unenforceable, this court must apply ordinary contract principles. See *Raiken v. Mellon,* 399 Pa.Super. 192, 582 A.2d 11, 13 (1990); *Matter of Klinker's Estate,* 80 Ill. App.3d 28, 35 Ill.Dec. 465, 467, 399 N.E.2d 299, 301 (1979). While the agreement in this case might have been more tightly drafted, it is the court's duty to examine it as a whole in order to determine its purpose and meaning. *Hawley by Cordell v. Hawley,* 904 S.W.2d 584, 586 (Mo.App.1995). "Dissection of an agreement into small, unrelated segments causes confusion and misunderstanding that vanish when the component parts are returned to the context of the whole contract." *Id.* (citing *Roberts v. Estate of Roberts,* 664 S.W.2d 634, 639 (Mo.App.1984)). To be valid, all the essential terms of a contract must be

sufficiently definite to enable the court to give them an exact meaning. *In re Marriage of Riley,* 817 S.W.2d 644, 646 (Mo.App. 1991).

A contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable people may fairly differ in their construction of the terms. *Ringstreet Northcrest, Inc. v. Bisanz,* 890 S.W.2d 713, 718 (Mo.App.1995). A contract is not ambiguous merely because the parties disagree over its meaning. *Jake C. Byers, Inc. v. J.B.C. Investments,* 834 S.W.2d 806, 816 (Mo.App.1992). To determine whether a contract is ambiguous, the court looks at the entire agreement and gives the words their plain and ordinary meaning. *Id.*

In voiding the agreement, the trial court focused on various provisions which it asserts are in such conflict that their meaning cannot be ascertained. Particularly, the court cites a conflict between paragraphs one, three, four and seven. Paragraph one proposes to allow each party to maintain their own property "free and clear of any and all rights of the other ... with full power ... to ... *devise and bequeath* ... in any and every way ... as if such party were single and unmarried." (Emphasis added by trial court). The court's judgment notes the absence of language such as "except as contained in this agreement" where paragraph three requires the husband to create a one-third trust share for the wife which she shall receive at his death. In addition, the court finds paragraphs three and four are inconsistent with paragraph seven where the wife acknowledges that the agreement "shall be a bar to her right of inheritance ... and all other rights in his estate." The court further finds paragraph four which allows the wife the "right to continue living in the principal residence ... until her death or remarriage" conflicts with paragraph seven which bars her rights in his estate. Finally, the court notes that paragraphs three (the trust share) and four (the right of wife to remain in the residence) do not mention divorce.

Having reviewed the agreement, which is not a model of draftsmanship, particularly as to the applicability of the

agreement vis-a-vis dissolution, this court concludes the agreement is sufficiently comprehensive in scope and detail to avoid being held totally unenforceable. The intent of the parties is clear and the trial court erred in voiding the entire agreement. Even without an "excepting" clause, it is clear the parties intended to retain control of their separate property, including the right to bequeath and devise, except that upon the husband's death, the wife would receive one-third trust share of his adjusted gross estate as per the agreement. In addition, since there was no comparable provision for the husband, he would take nothing of her estate, unless she were to alter this result by will. Furthermore, this court finds paragraph seven is a standard acknowledgement and waiver of statutory rights in a spouse's estate. Reading the document as a whole, it is clear that the parties are waiving their rights, except as otherwise contained in the agreement. The wife has presumably waived her statutory rights in reliance upon her right to receive, at Jim's death, an amount equal to one-third of the trust share. Finally, paragraph four regarding the wife's right to remain in the principal residence, states in the beginning that it takes effect only where the husband predeceases the wife. Also, the paragraph indicates she may remain in the "principal residence which *they* are living in at the time of [the husband's] death." The language assumes the parties are still married at his death and would not be applicable in the event of divorce. This court finds the agreement, when read as a whole and giving effect to the plain meaning of words used, is unambiguous and sufficiently definite for the court to give them exact meaning.

Also mitigating against the trial court's decision to void the entire agreement is the savings clause or severability clause in paragraph ten which states that even if part of the agreement is invalid, the remainder shall be in effect. In addition, the trial court made no findings of ambiguity or lack of definiteness regarding paragraphs two, five, six, eight, nine, ten, eleven or twelve.

Having determined the agreement is sufficiently clear to be enforced, the court must address several outstanding issues. First, the agreement contains no provision relating to the distribution of marital property upon divorce or separation. Therefore, upon remand, the trial court must identify and divide all marital property in a fair and equitable manner considering all relevant factors. Section 452.330 RSMo (Supp.1997).

Marital property is defined by § 452.330 as:

[A]ll property acquired by either spouse subsequent to the marriage except:

1. Property acquired by gift, bequest, devise, or descent;

2. Property acquired in exchange for property acquired prior to marriage or in exchange for property acquired by gift, bequest, devise, or descent;

3. Property acquired by a spouse after a decree of legal separation;

4. Property excluded by valid written agreement of the parties; and

5. The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.

Jim claims in his second point on appeal that the trial court erred in classifying the Piper Jaffray investment account and Casa II as marital property subject to division. § 452.330.2(4) provides that the parties may enter into a valid written agreement that property is nonmarital. Paragraph one of the McGilley's antenuptial agreement provides that the parties separate property real and personal, legal and equitable, income as well as principal shall remain separate. The Piper Jaffray account contained the proceeds from the sale of Jim's business which was his separate property under the agreement. Casa II was purchased from Jim's trust account income which would also be his separate property by agreement. The trust existed prior to the marriage and Jim was the life beneficiary.

Under the source of funds rule, whether property is characterized as marital

or nonmarital depends on the source of funds used to purchase the property. *Kettler v. Kettler*, 884 S.W.2d 729, (Mo.App.1994). In addition, under § 452.330.2(2), the trial court erred in dividing both Casa II and the Piper Jaffray account as marital property because property acquired in exchange for property acquired prior to the marriage is not marital property. *Ker v. Ker*, 776 S.W.2d 873, 876–77 (Mo.App.1989). The decision as to whether the Piper Jaffray account or Casa II have been transmuted into marital property will be left to the trial court. On remand the trial court should consider there was no indication of commingling of the proceeds from the sale of Jim's business with marital funds. Further, Casa II was purchased with trust money and was titled to the trust. Finally, any increase in the value of these properties is also nonmarital to the extent that the increase in the value of the account or real estate is due to market conditions rather than assets of the marriage. *Meservey v. Meservey*, 841 S.W.2d 240, 245–46 (Mo.App. 1992). Upon remand, the court is free to reconsider the designation of Casa II and the Piper Jaffray account as marital property, and the court shall then make and fair and equitable division of marital property.

In his third point, the husband maintains that the trial court abused its discretion in setting aside certain items of property, primarily art and furniture located in Casa II, as Tatjana's separate property. The trial court is vested with broad discretion in identifying and dividing marital property. *Whitworth v. Whitworth*, 878 S.W.2d 479, 484 (Mo.App.1994). This court finds no abuse of discretion in the trial court's judgment regarding this property. In addition, this court finds no inconsistency in the trial court's judgment. Even where the judgment awards the contents of Casa II to the husband in the division of marital property, the trial court may still isolate a list of the wife's separate property located therein.

Another remaining issue is the effect of the dissolution and Sec. 474.420 on paragraph three of the agreement regarding Tatjana's one-third share of Jim's adjusted gross estate upon his death. Paragraph three specifically requires that Jim by last will and testa-ment or in some other instrument effective at his death, establish a trust share equal to one-third of his adjusted gross estate. Testimony at trial indicates that during the marriage, Jim established a one-third trust share for Tatjana and that he changed the trust provisions to increase her share on several occasions. In addition, she was added as a co-trustee. As the marriage became troubled, and on the same day that he filed for dissolution, Jim revoked the trust, but added a provision to his last will and testament providing for Tatjana's one-third share.

Section 474.420, RSMo 1994, titled Change in Circumstances, dictates "if *after* making a will the testator is divorced, all provisions in the will in favor of the testator's spouse so divorced are thereby revoked but the effect of the revocation shall be the same as if the divorced spouse had died at the time of the divorce." (Emphasis added). The language of this statute has been declared plain and unambiguous by our Supreme Court. *Matter of Estate of Bloomer*, 620 S.W.2d 365, 367 (Mo. banc 1981). The statute revokes the provisions in a will in favor of a divorced spouse and the divorce results in the constructive death of the testator's spouse. *Id.*

Jim argues that he had the option under the antenuptial agreement to select the instrument with which to establish Tatjana's one-third share. He asserts his revocation of the trust and creation of the will provision satisfied the agreement, and now that the couple has divorced, he is entitled to take advantage of the § 474.420 and Tatjana is thereby disinherited. The net effect of this reasoning would result in Tatjana receiving little more than $10,000.00 under her separate property agreement and the statute.

A primary issue in antenuptial agreements is the fairness of the agreement. In this case, Tatjana had clearly relinquished a number of her statutory rights in the context of dissolution and estate law. She also agreed not to claim maintenance and allowed her husband to retain separate control over his significant assets, including the trust fund, the business, and all the income generated therefrom. He will retain the marital

home while she receives $10,000.00 to set up a household. Finally, in the event of death, she would not exercise her statutory rights in his estate. If this court construes the agreement to disinherit Tatjana, she will have relinquished substantial rights and property for essentially $10,000.00. In the interest of fairness and equity, this court must construe paragraph three, which does not contain any direction in the event of dissolution, to remain in effect.

At trial, with regard to paragraph three involving the one-third trust share, the attorney who represented Jim in drafting the prenuptial agreement testified to advising his client that in case of dissolution, paragraph three of the antenuptial agreement would no longer be effective. Tatjana's attorney testified that he advised her that she would still be entitled to a one-third share of her husband's estate even if the parties divorced. The language of paragraph three does not specifically address the effect of divorce on the agreement. This court will in the interest of equity and fairness enforce the agreement of the parties whether or not they remain married.

This court now addresses appellant's points challenging the trial court's award of non-modifiable maintenance to the wife. The agreement is clear and unambiguous in stating that the parties waive their right to maintenance. Antenuptial agreement provisions waiving maintenance claims have been approved by this court. See *Heineman v. Heineman,* 768 S.W.2d 130 (Mo.App.1989). This court will enforce the agreement and reverse the trial court's judgment awarding maintenance to Tatjana. Therefore, the court will not need to decide whether the non-modifiable aspect of the maintenance award was proper.

The judgment of the trial court is reversed and remanded for proceedings consistent with this opinion, i.e., 1) the antenuptial agreement shall be enforced, and Tatjana is to receive, by will, a one-third share of the trust; 2) the court may hear evidence on the nature of Casa II and the Piper Jaffray

account, and after so doing, divide the marital property and debts.

All concur.