**Helene Beth LOVE, Petitioner–
Respondent,**

v.

**Phillip Robert LOVE, Respondent–
Appellant.**

No. 24290.

Missouri Court of Appeals,
Southern District,
Division Two.

March 27, 2002.

Richard D. Bender, Springfield, for Appellant.

No appearance for Respondent.

PHILLIP R. GARRISON, Presiding Judge.

Phillip Robert Love ("Husband") appeals from a judgment entered in a dissolution of marriage case filed by Helene Beth Love ("Wife"). He claims that the trial court erred in finding that the marriage was irretrievably broken, in accepting statements contained in the written Guardian ad Litem ("GAL") report as true when such statements were not in evidence, and in ordering him to pay a retroactive child support amount that was not supported by the evidence. We affirm the trial court's judgment on the first two points, but reverse and remand on the third, and instruct the trial court to enter an amended decree reflecting the appropriate retroactive child support amount.

Husband and Wife were married on August 25, 1979 in New Jersey. There were four children born of the marriage, with the oldest born on January 27, 1981 and the youngest on January 9, 1990. Wife filed a petition for dissolution of marriage on April 21, 1998. In her petition, Wife stated that "[t]here is no reasonable likelihood that the marriage of the parties can be preserved and, therefore, the marriage is irretrievably broken." She further noted that Husband "has conducted himself in such a way that it has become impossible for [Wife] to continue to live in [the] marriage with him." Husband denied the allegations in his answer.

Trial was held December 6 and 7, 2000. Wife provided testimony to illustrate that the marriage was irretrievably broken. She testified that she and the children had become fearful of Husband due to his anger, and that he had been physically violent toward her. During the marriage, he struck her and also threw items at her in the presence of the children. Following their separation, he pulled a phone out of the wall and threw it across the room after she had asked to retrieve the children's birth certificates and social security cards, which would allow her to re-enroll the children in school. On three occasions, he violated a restraining order and attempted to see Wife at her place of work.

She also described incidents in which Husband acted in an authoritarian manner toward her, including telling her that she must inform him of what she intended to say during adult Sunday school classes so that she would not embarrass him. According to Wife's testimony, Husband would also make references to intellectual capacity, pointing out to her that she could not understand certain things because she had not attended graduate school or obtained "a degree in the Bible." In addition, Husband accused her of having affairs and, during one visitation following their separation, made the accusation in front of the children.

Wife also testified that Husband had been physically and emotionally abusive toward the children. She described incidents in which three of the four children had been either hit in the head or kicked by Husband. In addition, Husband once pulled an electrical cord from the wall, threw it in the trash, and told his two girls that they could not listen to music anymore, yet at no time asked or instructed the girls to turn down the volume of the music. Wife testified to another incident in which Husband restricted the children from watching a Disney movie because it was amoral; however, Wife found pornographic magazines in his dresser drawer, and Husband had recently attended an R-rated movie called *Indecent Proposal.*

During the marriage, the couple also experienced financial difficulties, at times not having enough money to buy food for the children. On one occasion, when Husband volunteered to bring snacks for 120 members of a Sunday school class, Wife

told him that she could not give him the money because she would have to take it out of their grocery money. He then made her call the teacher to explain why he could not follow through with his promise to provide the snacks. Wife later determined that the Sunday school teacher, based on the phone call, had given Husband $50 to help them buy groceries; however, Husband never gave her the money. In addition, their utilities were once disconnected because Husband failed to pay the bill.

Wife testified that Husband often indicated that God spoke to him directly regarding various matters in his life, including employment, his relationship with Wife, and the parenting of their children. Immediately prior to the separation, he told Wife that the voice of God had informed him that she "was too ungodly to raise the kids," and that she "needed to get out." According to Wife, the comment led her to leave, and also caused her concern that he might take the children out of Missouri. Husband's family lived in Texas at the time.

Husband testified that he did not think the marriage was irretrievably broken and that it could be saved. In response to a question regarding who was to blame for the breakup of the marriage, he noted that he did not have "one whit—one particle of complicity with the breakup[,]" and that he had "done everything [he could] to ... facilitate reconciliation." He further testified that he would "consider it morally reprehensible to sign a divorce paper agreeing to a divorce when it's not in my wife's best interest and ... not in my children's best interest." When questioned about incidents of physical abuse toward his children, he referred to his actions as "momentary lapse[s] of judgment," and "mild reproof[s]" or as being accomplished within "the context of regular discipline."

In addition to hearing testimony relating to the irretrievability of the marriage, the trial court heard testimony regarding maintenance, child custody and child support issues. In particular, Wife asked the trial court to find that retroactive child support was warranted. According to her testimony, since their separation, Husband had paid child support in the amount of $2,160. In calculating her request for retroactive child support, Wife took into account that their oldest child turned eighteen in 1999, and thus, child support was only included for the other three children beyond his birthday that year. In addition, monthly income of $1,440 was imputed to Husband, and Wife testified that her monthly income had been $1,351, but was currently $1,560 for the job she had held since June 2000.

With regard to health care coverage, Husband testified that he had health insurance coverage through his current employer for the whole family (including Wife) at a cost of approximately $332 per month. However, Wife testified that she was unaware of such coverage, and had not received a health insurance card or any other notification of coverage through Husband's employer. She maintained that, since the separation, health care for the children had been covered through Medicaid. She further testified that the children would be eligible for coverage from her employer beginning in January 2001, with an approximate monthly premium of $260. As for total retroactive child support, after offsetting the amount Husband had paid, Wife testified that she was owed $11,549.97.

The trial court appointed a GAL in the case due to the alleged physical and emotional abuse committed by Husband. At the close of the evidence, the GAL was

asked if he had a recommendation in the case. He stated that he could provide either an oral recommendation on the record or a written recommendation. The trial court indicated a preference for a written recommendation, which the GAL submitted four days after the completion of the trial. In that report, the GAL recommended that the trial court implement Wife's parenting plan, under which she would be awarded primary physical custody of the three unemancipated children, and Husband would continue supervised visitation.

On April 20, 2001, the trial court entered its "Findings and Recommendations for Judgment of Dissolution of Marriage" and the "Judgment and Decree of Dissolution of Marriage." One finding was that "[t]here remains no reasonable likelihood [that] the marriage can be preserved and therefore the marriage is irretrievably broken." The trial court further noted that its findings and recommendations with regard to child custody, support, and visitation were made in the best interest of the children, pursuant to factors outlined in §§ 452.375 and 452.400.[1] In its findings, the trial court made various references to the GAL's report, including the wishes of the children as to their custodian.

In the "Judgment and Decree of Dissolution of Marriage," the trial court ordered the parties to comply with the parenting plan under which Wife was awarded primary physical custody. The trial court also indicated that it had "considered . . . [Husband's] history of inflicting or tendency to inflict physical harm or fear of harm to the children and . . . [Wife] and therefore order[ed] supervised visitation to protect the children and [Wife] from further harm." In addition, Wife was awarded retroactive child support in the amount of $15,261.

 In his first point, Husband charges that there was insufficient evidence to support the trial court's finding that the marriage was irretrievably broken. As this was a court-tried case, "we must affirm [the] decree . . . unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law or unless it erroneously applies the law." *In re Fuldner,* 41 S.W.3d 581, 587 (Mo.App. S.D.2001). Judging credibility and assigning weight to evidence and testimony are matters "for the trial court, which is free to believe none, part, or all of the testimony of any witnesses." *In re Marriage of Haugh,* 978 S.W.2d 80, 82 (Mo.App. S.D.1998). Thus, we will "defer to the trial court's determinations of credibility, viewing the evidence and permissible inferences therefrom in the light most favorable to the decree and disregarding all contrary evidence and inferences." *Fuldner,* 41 S.W.3d at 587.

Wife alleged in her petition that the marriage was irretrievably broken, an allegation that Husband denied. In such a case, before the trial court can find that the marriage is irretrievably broken, it must be satisfied that the petitioner (Wife, here) has established one of the five factual scenarios provided under § 452.320.2(1). *See Nieters v. Nieters,* 815 S.W.2d 124, 125–26 (Mo.App. E.D.1991). Those five are as follows:

 (a) That the respondent has committed adultery and the petitioner finds it intolerable to live with the respondent;

 (b) That the respondent has behaved in such a way that the petitioner

---

1. Unless otherwise noted, all statutory references are to RSMo (2000).

cannot reasonably be expected to live with the respondent;

(c) That the respondent has abandoned the petitioner for a continuous period of at least six months preceding the presentation of the petition;

(d) That the parties to the marriage have lived separate and apart by mutual consent for a continuous period of twelve months immediately preceding the filing of the petition;

(e) That the parties to the marriage have lived separate and apart for a continuous period of at least twenty-four months preceding the filing of the petition.

§ 452.320.2(1).

■ The trial court is not required to identify which of the enumerated factors led to its finding that the marriage was irretrievably broken. *See Frerichs v. Frerichs,* 704 S.W.2d 258, 261 (Mo.App. E.D. 1986); *Nieters,* 815 S.W.2d at 126. However, it is clear that § 452.320.2(1)(b) is the only one that applies here. Wife acknowledged as much in her petition when she alleged that Husband "has conducted himself in such a way that it has become impossible for [Wife] to continue to live in [the] marriage with him."

A review of the cases involving a finding that a marriage was irretrievably broken show that this is a very fact-sensitive area. *See Welsh v. Welsh,* 869 S.W.2d 802, 805 (Mo.App. E.D.1994). Husband is correct that "[m]ere conclusions, unsupported by facts, are insufficient." *Id.* He directs our attention to cases in which such a finding was reversed for lack of substantial evidence. *See Nieters,* 815 S.W.2d at 126 (testimony by husband that parties could not get along or that it had been somewhat violent over the years did not provide substantial evidence); *In re Marriage of Dillon,* 559 S.W.2d 81, 83 (Mo.App.1977) (only testimony given was that "certain differences" had arisen in the marriage, which was insufficient evidence).

■ However, the instant case is more comparable to the *Haugh* case in which there was a substantial amount of evidence and testimony presented that showed the husband's dictatorial and repressive behavior toward his wife and children. 978 S.W.2d at 84–85. In that case as well, there was testimony regarding the husband's use of excessive force when disciplining the children. *Id.* at 84. Viewed favorably to the decree, and recalling that it is for the trial court to judge the credibility of the witnesses, there was ample evidence before the trial court here to demonstrate that, based on Husband's conduct, Wife could not reasonably be expected to live with him, and that the marriage was irretrievably broken. Husband's first point is denied.

■ Husband's second point charges that the trial court erred in awarding Wife primary physical custody because, in reaching that decision, it accepted as true the GAL's statements in his written report that the children preferred to live with their mother. As outlined above, at the close of the evidence, the GAL was asked if he had a recommendation in the case. However, rather than provide an oral recommendation on the record, he agreed to abide by the trial court's request to submit a written recommendation. Although the GAL report is not file-stamped, the docket reflects that it was received by the court on December 11, 2000, four days following the trial.

■ "The mere filing of a document does not put it into evidence." *In re Morrison,* 987 S.W.2d 475, 479 (Mo.App. S.D. 1999). However, the trial court indicated that once the GAL's written recommendation was received, it would be considered

along with the other evidence presented. Thus, if we assume that the report and any recommendations or statements contained therein were used by the trial court as evidence, we note that Husband did not object to either the fact that the trial court would receive the GAL's report at a later date or that the trial court would consider it along with the other evidence. "Failure to object at the earliest opportunity to the admission of evidence ... constitutes a waiver of the claim." *State v. Cosby*, 976 S.W.2d 464, 467 (Mo.App. E.D.1998).

■■■■ If, however, we assume that since the contents of the report (and thus, any alleged inadmissible statements from the children regarding their wishes) were unknown until the report was actually submitted to the trial court, we may give Husband the benefit of the doubt regarding his failure to object at trial to the contents of the report. We note however, that even if the report and the statements contained therein did indeed constitute inadmissible evidence, that alone would not provide a basis for finding reversible error. *See Sanfilippo v. Sanfilippo*, 637 S.W.2d 77, 79 (Mo.App. E.D.1982). "[I]n a court-tried case, erroneous admission of evidence only requires reversal where there is an absence of other sufficient competent evidence to support the decree." *Id.*

Husband points to a recent case in which an oral report given by a GAL at the close of evidence, which contained unsworn testimony and hearsay statements regarding facts not in evidence, was the basis for the appellate court's finding of prejudicial error. *See Dickerson v. Dickerson*, 55 S.W.3d 867, 874–75 (Mo.App. W.D.2001). However, the appellate court in *Dickerson* determined there "was prejudicial error because the trial record did not otherwise support the custody award." *Id.* at 875. The case at bar is not a similar situation.

In his point relied on, Husband claims that the error was caused by the trial court accepting as true the GAL's written recommendation regarding the wishes of the children. In its findings, the trial court did state that, "through the [GAL][,] ... all of the minor children prefer to live with their mother." However, the court further found that "[t]here was no evidence to suggest in the record that any of the children had a desire or wanted to have their father as their primary custodian." In addition, as partially addressed in point one, there was substantial evidence presented to the trial court on the other statutory factors, as it considered the best interests of the children, the general fitness of Husband and Wife as parents and various other circumstances, including any history of abuse.[2] *See* § 452.375.2. Thus, even if the statements to which Husband refers were erroneously considered by the trial court, we find that the custody provi-

---

**2.** In total, § 452.375.2 requires that "[t]he court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including: (1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties; (2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child; (3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent; (5) The child's adjustment to the child's home, school, and community; (6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a

sion of the decree is supported by substantial evidence and deny this point.

In his third point, Husband alleges that the trial court erred in ordering him to pay retroactive child support in the amount of $15,261. He claims that the amount was not supported by the evidence. In particular, he argues that the amount is in error because, in its calculation of the retroactive child support award, the trial court included $260 as monthly health care costs for the children. He claims that since the children were covered by Medicaid during that time, Wife was not required to pay that amount, or any amount, for their health care. He does concede, however, that retroactive child support was warranted, and that the proper amount is $11,549.97.

■ We first note that Husband provided no legal authority or support for his contention, which, under strict compliance with Rule 84.04(d), would constitute a waiver of the claim. *See In re Marriage of Kempf,* 825 S.W.2d 667, 668 (Mo.App. S.D.1992). However, since determining the correct amount is fairly straightforward, we will proceed.

Husband testified that he had health insurance coverage through his current employer for the whole family (including Wife) at a cost of approximately $332 per month. However, Wife testified that she was unaware of such coverage, and had not received a health insurance card or any other notification of coverage through Husband's employer. According to Wife, since the separation, health care for the children had been covered through Medicaid, but that, beginning in January 2001, she would be eligible to receive health insurance for the children for a monthly premium of approximately $260.

■ There is case law that demonstrates that receipt of child support may adversely affect a child's coverage under Medicaid. *See In re Marriage of Baker,* 986 S.W.2d 950, 955 (Mo.App. S.D.1999). In addition, where two plans are available for health care coverage of a child, the trial court should compare plans with regard to cost and overall coverage. *See Taranto v. Dept. of Social Services,* 962 S.W.2d 897, 903 (Mo.App. W.D.1998). Lastly, although the directions provided on the Form 14 require that Medicaid benefits be excluded from the computation of gross income, there are no similar directions to exclude Medicaid when determining other child-rearing costs, such as the cost of health care coverage. *See State ex rel. Child Support Enfor. v. Kost,* 964 S.W.2d 528, 528 n. 1 (Mo.App. W.D.1998).

■ Reconciling the cases with the facts here, we find that although it was proper to include the $260 monthly health care cost in the calculation of the prospective child support award, the trial court did err by including the $260 as part of the retroactive child support award, since the children were covered under Medicaid during that time. All parties agree that the appropriate amount is $11,549.97.

Therefore, we reverse and remand on this point with instructions to the trial court to enter an amended decree reflecting a retroactive child support award of $11,549.97. In all other respects, the judgment is affirmed.

PREWITT, J., and PARRISH, J., concur.

---

manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm; (7) The intention of either parent to relocate the principal residence of the child; and (8) The wishes of a child as to the child's custodian."