In re The MARRIAGE OF Bud Harrison THOMAS and Alice Carolyn Thomas.

Bud Harrison Thomas, Appellant,

v.

Alice Carolyn Thomas, Respondent,

and

Twin Willow Farms, L.L.C., Third–Party Respondent,

and

Twin Willow Equine Center, L.L.C., Third–Party Respondent.

Nos. 27155, 27146.

Missouri Court of Appeals, Southern District, Division Two.

July 12, 2006.

Motion for Rehearing or Transfer Denied Aug. 2, 2006.

Application for Transfer Denied Sept. 26, 2006.

Richard L. Schnake & Paul G. White, Neale & Newman, L.L.P., Springfield, for appellant.

Susan S. Jensen & Lisha A. Masters, Pratt, Fossard, Jensen & Masters, L.L.C., Springfield, for respondent.

ROBERT S. BARNEY, Judge.

Appellant Bud Harrison Thomas ("Husband") appeals the trial court's third amended judgment dissolving his marriage to Respondent Alice Carolyn Thomas ("Wife"). In its judgment, the trial court invalidated the parties' antenuptial agreement; alternatively determined Husband had transmuted his interest in a certain corporation designated as non-marital property under the terms of the antenuptial agreement; granted wife modifiable maintenance of $12,178.00 per month; and awarded Wife attorney's fees in the amount of $63,437.00. Additionally, in its final division of net marital properties, the trial court awarded Wife assets worth approximately $1,681,542.72 (inclusive of a monetary award from Husband of $503,314.85); awarded Husband assets valued at $1,681,542.72; and divided the par-

ties' marital and non-marital property.[1] Husband brings seven points on appeal.

In a dissolution proceeding, the appellate court must affirm the trial court's decree unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Rivers v. Rivers*, 21 S.W.3d 117, 121 (Mo.App.2000). The trial court is given broad discretion in dividing property and we will interfere with its decision only if the division is so unduly weighted in favor of one party that it amounts to an abuse of discretion. *Kirkwood v. Kirkwood*, 77 S.W.3d 675, 680 (Mo.App.2002). The trial court abuses its discretion only when its ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *In re Marriage of Holden*, 81 S.W.3d 217, 225 (Mo.App.2002). We review the evidence and inferences in the light most favorable to the trial court's decision and disregard all contrary evidence and inferences. *See Kirkwood*, 77 S.W.3d at 680. "Judging credibility and assigning weight to evidence and testimony are matters 'for the trial court, which is free to believe none, part, or all of the testimony of any witnesses.'" *Love v. Love*, 72 S.W.3d 167, 171 (Mo.App.2002) (quoting *In re Marriage of Haugh*, 978 S.W.2d 80, 82 (Mo.App.1998)). The party challenging the trial court's judgment in a dissolution has the burden of demonstrating error. *Kirkwood*, 77 S.W.3d at 680.

Husband's first three points on appeal all relate to alleged trial court errors involving an antenuptial agreement executed by the parties. For the sake of judicial economy and clarity, we shall review these points conjunctively. In his first point, Husband maintains the trial court erred in declaring the antenuptial agreement to be invalid and unenforceable because such a ruling was against the weight of the evidence. He maintains the parties entered into the antenuptial agreement "freely, fairly, knowingly, understandingly, and in good faith with full disclosure ..." in that Wife "admitted that her lawyer explained [the agreement] and that she understood her rights with and without the agreement and that she still deliberately executed it...." Further, Husband maintains the agreement was "not unconscionable, since it was essentially mutual ..." and Wife "gave up no interest in her own separate property." In his second point, Husband asserts the trial court erred in declaring the parties' antenuptial agreement to be invalid and unenforceable because "the court properly declared that the fairness of a[n] [ante]nuptial agreement must be judged as of the date of its execution, but it nevertheless relied upon post-execution events in determining the fairness of the agreement." In Husband's third point of trial court error, he asserts the trial court erred in its characterization of Infinite Innovations, Inc. ("the Corporation") as marital property, because the Corporation should have been declared to be Husband's separate property per the terms of the antenuptial agreement, which the trial court should have enforced. Husband also takes umbrage at the trial court's division of marital property based on the classifica-

---

1. Respondent Twin Willow Farms, L.L.C. ("the Farm") is an equine breeding and training facility located in Springfield, Missouri, which was awarded to Husband in the trial court's division of marital property. Respondent Twin Willow Equine Center, L.L.C. ("the Equine Center") is an equine breeding and training facility located in Shelbyville, Tennessee, which Wife has been operating and maintaining for the past three years and which was awarded to Wife in the trial court's judgment. Neither of the aforementioned entities actively participated in this appeal.

tion of the Corporation as marital property, and in its award of maintenance and attorney's fees to Wife because under the terms of the antenuptial agreement Wife was not entitled to either maintenance or attorney's fees.

At the outset, we note that it is well-settled law that an antenuptial agreement contemplating the dissolution of a parties' marriage is "not against public policy and can be valid." *In re Marriage of Lewis,* 808 S.W.2d 919, 922 (Mo.App. 1991). " 'In Missouri, to be valid and enforceable an antenuptial agreement must be entered into freely, fairly, knowingly, understandingly, and in good faith with full disclosure.' " *Kester v. Kester,* 108 S.W.3d 213, 218 (Mo.App.2003) (quoting *Rivers,* 21 S.W.3d at 122). This requirement "has been interpreted by the courts to involve a subjective evaluation of the fairness surrounding the execution of the agreement." *Miles v. Werle,* 977 S.W.2d 297, 301 (Mo.App.1998). "Factors which courts have considered relevant include the signatories' access to independent counsel, the amount of time available to revise the agreement, the bargaining positions of each spouse in terms of age, sophistication, education, employment, and experience, and whether their assets were fully disclosed." *Id.* "The fairness of the agreement must be determined as of the date of the agreement." *Hosmer v. Hosmer,* 611 S.W.2d 32, 35 (Mo.App.1980).

Additionally, antenuptial agreements will be upheld and will dispose of issues of property division unless found to be unconscionable. *McGilley v. McGilley,* 951 S.W.2d 632, 637 (Mo.App.1997). "An agreement is unconscionable when the 'inequality is so strong, gross, and manifest that it must be impossible to state it to one with common sense without producing an exclamation at the inequality of it.' " *Id.* (quoting *McMullin v. McMullin,* 926 S.W.2d 108, 110 (Mo.App.1996)). "Conscionability ... mean[s] protection against onesidedness, oppression or unfair surprise." *Ferry v. Ferry,* 586 S.W.2d 782, 786 (Mo.App.1979). Binding parties to the "provisions of an ante-nuptial agreement only if the agreement was conscionable and fairly made, 'afford[s] protection to the unwary and ill-informed spouse.' " *In re Estate of Robertson,* 60 S.W.3d 686, 691 (Mo.App.2001) (quoting *Ferry,* 586 S.W.2d at 786).

"At trial, the burden of proof on the issue of the validity of the antenuptial agreement rests with the party seeking to invalidate the agreement." *McGilley,* 951 S.W.2d at 637. The "validity of an ante-nuptial agreement is governed by rules that 'are unique and are distinct from the requirements for the execution of an ordinary contract.' " *In re Estate of Robertson,* 60 S.W.3d at 689 (quoting *Hosmer,* 611 S.W.2d at 35). "This is particularly true in terms of consideration, where an ante-nuptial agreement requires more than that necessary for a simple contract, in 'that the consideration moving to the spouse or prospective spouse surrendering marital rights is to be fair and equitable in the particular circumstances.' " *Id.* (quoting *Hosmer,* 611 S.W.2d at 35).

In situations where "there is a[n] [antenuptial] agreement, the character of the property as community/marital or separate is not determined by the presumptions set forth by statute or case, but by the terms of the contract." [2] *Dardick v. Dardick,* 948 S.W.2d 268, 270 (Mo.App.

---

2. By *statute,* "marital property" in a dissolution proceeding does not include "[p]roperty excluded by valid written agreement of the parties." § 452.330.2(4).

All statutory references are to RSMo 2000 unless otherwise stated.

1997). "An antenuptial agreement must ... be read as a whole in order to determine its purpose and meaning." *Hawley by Cordell v. Hawley*, 904 S.W.2d 584, 586 (Mo.App.1995).

Viewing the record in the light most favorable to the trial court's judgment, *Kirkwood*, 77 S.W.3d at 680, the record reveals that the parties were married on August 27, 1988, and that Husband filed his amended petition to dissolve the marriage on July 28, 2003. At the time of trial, Husband was forty-three years old and Wife was forty-one years old.

Wife testified at trial that Husband first mentioned the antenuptial agreement "[t]he week prior to the marriage when [they] were driving to see the pastor for counseling...." According to Wife, Husband told her

> that [the agreement] was just merely, you know, to protect the partnership; that it was something that him and his partner agreed upon; that they would have their wives sign a[n] [ante]nuptial so there wouldn't be any problems within the marriage and the partnership, because his partner had actually been married, like, four times, and [she] was [Husband's] third, and so they just felt like that was something—he just told [her] it was a formality that [she] needed to do.

Wife acknowledged that she saw an attorney, David Holden ("Holden"), prior to signing the agreement; that she saw Holden "one time;" and that she signed the agreement during that meeting, although "[she] really [did not] recall ... [their] actual meeting or anything." She stated that Husband was not present during her meeting with Holden and that she

"sign[ed] the paper as it was presented" without requesting any changes.[3] She went on to state that at the time the agreement was signed she "had been advised as to what [her] rights were with and without [the] agreement ..." and "knowing what those rights were, [she] went forward with the execution of the agreement...."

Further, in her deposition, which was entered into evidence at trial, Wife testified she did not specifically remember any conversations with Husband regarding the details of the antenuptial agreement but she assumed they had discussed it; she was "represented by an attorney in regard to the antenuptial agreement ...," but she did not recall him specifically explaining the agreement to her; and she "had the opportunity to meet with [her] own counsel" prior to signing the agreement. She stated that she would never have signed the statement saying she met with counsel if she had not done so and that she was "not disputing that [she] didn't meet with counsel; [she] just d[id not] remember any of the conversation." When asked if she was under pressure to sign the agreement, she stated that she "had to sign it before [they] could get married." Accordingly, she related that she had been willing to sign the agreement and that she understood she was "choosing marriage over money...."

Wife also testified that she did not actually sign the antenuptial agreement until two days before the wedding on August 25, 1987. She stated that at that time she felt that she was under "duress or stress that caused [her] to sign this [ante]nuptial agreement."

---

3. The *"STATEMENT OF SEPARATE CONSULTATION"* found in the agreement states:
 I, [Wife] state that I received counsel from Attorney David G Holden, concerning the

above Ante–Nuptial Agreement and I was advised of my rights with and without such an agreement.
 /s/ [Wife]

Also, Wife noted that the idea that she had already sent the wedding invitations out weighed on her mind and that she felt "there wasn't an option for [her] to say no, [she was] not going to sign it . . . [b]ecause [they] were getting married . . . [she] had the plans, had set everything, and [she] loved [her] husband and wanted to marry him." She stated that it would "have been embarrassing to call off the wedding" at such a late date.

She also related that she did not have sufficient time to consider the implications of signing the antenuptial agreement. However, when asked "what difference would time have made to [her] . . ." regarding signing the agreement, Wife stated that it "wasn't time. [She] wasn't given a choice . . . [she] was lead to believe that [the agreement] was strictly for the partnership, meaning it was strictly because . . . [Jerry Ahart ('Ahart') husband's partner in the corporation] wanted [Husband] to do that." She stated that

> [i]f [Husband] would have presented it to [her] a year prior, [she] would have had time to look over it, review it, understand what it really entailed and what was really going on. And when it's two days before your wedding—actually, it was a week when he presented it to [her]—[she] was caught up in the wedding, and it was just something—a formality that [she] had to do.

Wife testified she loved Husband and had wanted to marry him even after he presented her with the agreement; she understood that a condition to marrying Husband was that she sign the agreement; and had she had more time to consider the agreement, "[i]t might have allowed [them] to be able to discuss it, change it . . . to make it . . . not so one-sided."

Wife testified that once she and Husband were married, Husband

told [her] that [the agreement] wasn't valid. He used to tell [her] that he [had] done away with it; that it didn't make a difference because, you know, of the business and how it was ran and how [they] were doing it; that it was strictly for the partnership deal, and he lead [her] to believe throughout [their] marriage that there was no [ante]nuptial agreement.

Further, she stated that Husband led her to believe the Corporation was a venture they owned "together" and that the Corporation was their "company, [their] business, [their] baby . . . [which they] were building for [their] future and [their] retirement."

At trial, Husband testified that he had been married twice prior to his relationship with Wife and that Wife had been married on one other occasion. Husband and Wife began dating in 1987, and by the time he and Wife began cohabitating in December of 1987, they had discussed the possibility of getting married as well as Husband's hesitations about getting remarried. Husband testified that "the advent of [his prior] divorces [was] on [his] mind at the time [he] began discussions with [Wife] regarding marriage." Husband stated that prior to moving in with Wife, he discussed with her the fact that in the event he got remarried he would "have a[n] [ante]nuptial agreement." He related that such an agreement was important to him because he "had just got [his] head back above water and out of debt from the previous two marriages;" in his previous marriages he "had been taken serious advantage of . . ." by his previous wives; and his "[business] partner and [he] had been working on [their] business for many years . . . [and][he] wanted some protection." Husband stated that Wife seemed to understand his position "because [he] was very open with . . . what had happened

[with] both previous marriages, and, obviously, it would have been a concern for her with being married twice...."

Husband also acknowledged that at the time of the marriage, Wife had essentially no assets and she understood that they "would share everything that [they] had that was marital property, that [they] acquired, it would be shared 50/50 with her."

The record also reveals that months prior to moving in with Wife, Husband approached the Corporation's attorney, Jim Sivils ("Sivils"), regarding an antenuptial agreement, and in early June of 1988 he and Wife met with Sivils for the first time. Husband stated they told Sivils that the main issue was the protection of the Corporation and the fact that "in no way, shape, nor form would it be allowed ... to be considered marital property." [4]

Husband also related that he and Wife had separate counsel, which is reflected in the signatures on the agreement itself. Husband's attorney recommended several attorneys for Wife to consult with and she chose Holden. He stated the parties had a first draft of the agreement "in the latter part of June/July ..." of 1988, and they were married in late August of that year. Husband testified that the reason the agreement was not signed until August 25, 1988, two days prior to the wedding, was because the parties had been busy with wedding preparations. Husband also testified that he never told Wife the antenuptial agreement was invalid; that he had torn it up; or that it was "no good."

Regarding the Corporation, Husband testified he started the Corporation with Ahart, several years prior to the parties' marriage, but that between 1990 and 1992 the Corporation itself bought back Ahart's stock. [5] He related no marital funds were expended in the stock purchase, and that he was the sole shareholder of all the stock in the Corporation.

Approximately a year after their marriage, Wife quit her job at Mid America Credit Union as a loan officer and went to work for Husband at the Corporation. Husband testified Wife worked daily for the Corporation from 1990 to 1995, but that by 1997 she was working only a few days a week. At the time of trial, Wife still received a salary of approximately $3,000.00 every two weeks from the Corporation, although she had performed no actual work for the Corporation since 1998. The Corporation covered Wife's medical insurance under its group policy until Husband canceled the group policy in April of 2001 due to increasing rates, and he obtained an individual plan for himself and Wife through the Farm.

4. Provision "11." of the antenuptial agreement relating to the Corporation states:
 It is understood that one of the assets of which [Husband] has an interest in is a corporation known as [the Corporation]. It is further understood that during the marriage, he intends to devote time, effort, and perhaps some of his individual resources toward said business. The same is closely held by him and Jerry Ahart. The parties understand that the value of said business cannot be readily ascertained, and that the same may rapidly increase in value, and may be of great value now or in the near future. [Wife], being aware of the facts set forth in this paragraph, acknowledges that she has voluntarily given up any right to an ownership interest in said corporation, or to make any claim to any interest thereby by virtue of becoming or being the Wife of [Husband]. She further agrees that [Husband] may deal with any party, including Jerry Ahart, as to the ownership and control of said corporate stock, and that agreement will have priority against any interest she may have in said stock because of said marriage or at any future time.

5. The Corporation paid Ahart approximately $500,000.00 for his half of the stock in the Corporation which was ultimately retired.

Husband also testified that in 1998 Wife was diagnosed with melanoma cancer and that in seeking treatment he and Wife traveled extensively to such places as Germany, Texas, and Arizona to see different doctors. Wife's cancer was in remission for a period of time, but when it returned in the fall of 2002 it had spread to her pelvis and lungs. Husband and Wife stopped living together in late March of 2000. He stated that Wife became depressed after they returned from a series of treatments in Germany and she told Husband that she wanted to go to their farm in Tennessee to "get away from everything" for awhile. By the end of that summer, Husband asked Wife to return to Missouri from Tennessee and she informed him that she was not coming home. At trial, Wife testified she had been residing in Shelbyville, Tennessee, for approximately three years.

In its judgment, the trial court made several findings as to the antenuptial agreement. The trial court began its analysis by

> find[ing] credible the testimony that [Wife] was told by [Husband] that the reason he wanted the ant[e]nuptial agreement was to protect a business partnership between [Husband] and [Ahart] ... The Court further finds credible the testimony that the agreement would protect the business if the partner, [Ahart], had marriage problems again.

However, the trial court "determine[d] the antenuptial agreement to be void, invalid and unenforceable."

In finding the antenuptial agreement was not entered into "fairly," the trial court made the following findings of fact:

> When the antenuptial agreement was executed, [Wife] was 25 years old with no business experience. [Husband], on the other hand, was a few years older and had experience in dealing with contracts and developing business. [Husband's] net assets as listed on the antenuptial agreement totaled $380,800[.00] ... [Wife's] assets of jewelry and personal property totaled a net of negative $700[.00]. Even though [Husband] required [Wife] to sign the antenuptial agreement before he would marry her, [Husband] did not tell [Wife] about this prerequisite until approximately one week prior to the wedding ...

> Given the situation in which [Wife] found herself, she had no choice but to sign the antenuptial agreement. She did so only two days before their wedding. The circumstances surrounding the presentation of the antenuptial agreement to [Wife] did not allow her to enter into it freely and fairly....

> Although [Wife] was represented by independent counsel, the circumstances of that representation and the execution of the antenuptial agreement indicate that the representation was not meaningful.[6]

The trial court found the portions of the antenuptial agreement entitled "2. *Release of Marital Rights by [Wife]*" and "14. *Dissolution of Marriage*" were unconscionable at the time the parties signed the agreement.[7] In support of its findings, the trial court stated:

**6.** In her answer to Husband's petition Wife raised the issue that she "was without adequate representation ..." at the time she signed the agreement; however, at trial, Wife's counsel stated that Wife was not making a claim that attorney Holden did not adequately represent her and requested that issue be stricken from the pleadings. Accordingly, that issue was stricken from the record although it was, nevertheless, ruled upon by the trial court.

**7.** Provision "2. *Release of Marital Rights by [Wife]*" reads:

As mentioned above, [Husband] had $380,800[.00] in net assets ... [Wife] on the other hand, had a negative asset value. Thus, the antenuptial agreement operated solely to insulate [Husband's] assets from [Wife] ... [Wife] gains virtually nothing by signing this document. The only thing she gains is having any increase in the value of [Husband's] property by reason of inflation be treated as marital property ... To get a full picture of the conscionability of the antenuptial agreement the little [Wife] gained by signing the antenuptial agreement must be compared to what she lost. She lost any right to [the Corporation] ... She lost the right to receive maintenance ... the right to receive attorney fees ... the right to request reimbursement for costs she incurs in a divorce action ... [Wife] gave up far more than she gained.

\* \* \*

The terms of the antenuptial agreement are unconscionable because they are so one-sided in favor of [Husband] ... [Wife] worked for [the Corporation] for most of the marriage. They had very little retirement compared to their

[Wife] hereby waives and releases all right and interest, statutory or otherwise, including, but not limited to, marital right, widow's allowances, homestead rights, dower, curtesy, statutory allowances, distribution by way of intestacy, the right to act as administrator, executor, or personal representative of the estate of [Husband], and the right to acquire as the Wife, widow, heir at law, next of kin or distributee of [Husband], in his property, owned by him at the time of the marriage anticipated herein and remaining in his estate upon his death, subject to substitution as mentioned in Paragraph 7.

Provision "14. *Dissolution of Marriage*" reads:

If the parties' marriage is legally terminated in accordance with the law of any jurisdiction which they, or either of them, may be domiciled, then, in that event, neither

earnings because they put all that money back into the business. [Wife] believed [the Corporation] was their retirement. She thought of [the Corporation] as marital property shared between she and [Husband] ... She was at [Husband's] side the entire way on equal footing ... [Husband] and [Wife] made many sacrifices together early on for the sake of the business ... Now that this [marriage] is ending by [Husband's] choice, it seems patently unfair to deprive [Wife] of any part of what she helped build, especially when [Husband] repeatedly denied that he would deprive her any of it.

 In our analysis, we first turn to the issue of whether or not Wife entered into the antenuptial agreement " 'freely, fairly, knowingly, understandingly, and in good faith with full disclosure.' " *Kester*, 108 S.W.3d at 218 (quoting *Rivers*, 21 S.W.3d at 122).

By her own admission in her deposition entered into evidence, Wife had "access to independent counsel ..." and was advised of her rights. *See Miles*, 977 S.W.2d at 301. In her deposition, Wife stated that:

shall be entitled to any alimony, maintenance, support money, costs, attorney fees, or any other money by virtue thereof. However, this does not preclude the court from dividing "marital property" and making adequate provisions for the support of the minor children, if any. In determining marital property, the parties agree that the increase in value of the properties shown on Exhibit "A", except for [the Corporation], shall be considered as marital property. That is, the increase in net value of the property as far as the party is concerned, occurring because of a decrease in indebtednesses, improvements on said property, or inflation, shall be considered marital property. This provision may be cited by either party to any court of competent jurisdiction, as a waiver and release of any money payment as aforesaid by one to the other.

she was "represented by an attorney in regard to the antenuptial agreement ...;" "[she] had the opportunity to meet with [her] own counsel;" she signed the agreement after such a meeting; and she was "not disputing that [she] didn't meet with counsel...."

At trial, Wife testified she saw an attorney prior to signing the agreement; she "sign[ed] the paper as it was presented" to her without requesting any changes; and that she "had been advised [by her attorney] as to what [her] rights were with and without [the] agreement...." Wife also asserted she would never have signed the statement saying she met with counsel if she had not done so. Additionally, she readily admitted that her signature appears on the agreement in the "*STATEMENT OF SEPARATE CONSULTATION.*"

■ It is clear from our review of Wife's testimony that she understood the terms of the antenuptial agreement at the time she signed it. Wife testified she had no questions regarding the antenuptial agreement prior to signing it; she knew "what [her] rights were with and without [the] agreement ...;" "knowing what those rights were, [she] went forward with the execution of the agreement ...;" and she clearly understood the terms of the agreement. Additionally, Wife testified she knew *when she signed the agreement* that she would not be able to claim any ownership in the Corporation in the future and she was waiving her rights to maintenance and attorney's fees. Specifically, she stated she understood the antenuptial agreement "excluded [her] interest in [the

Corporation] ..." and she understood she was "choosing marriage over money ..." by signing it. "An antenuptial agreement's recitals that both parties have been advised as to their rights in the other's property establish, prima facie, that the ... spouse was advised as to his or her legal rights." *In re Estate of Reinsmidt,* 897 S.W.2d 73, 77 (Mo.App.1995).

Regarding "the amount of time available to revise the agreement ...," *Miles,* 977 S.W.2d at 301, on cross-examination, Wife testified that the problem with signing the agreement "wasn't time." It was that she was not "given a choice ..." about signing the agreement in order to marry Husband. We note, however, that in *In re Estate of Robertson,* 60 S.W.3d at 690, under a similar set of facts, the *Robertson* court held the antenuptial agreement was not unconscionable where husband signed an antenuptial agreement a "mere four days" prior to the wedding, in light of the fact that he admitted he understood the terms of the agreement.

■ Further, when asked at trial if she was under pressure to sign the agreement, Wife testified she knew she "had to sign it before [they] could get married." Wife stated that when she signed the agreement two days prior to her wedding she felt that she was under "duress [8] or stress that caused [her] to sign this [ante-]nuptial agreement," but she was willing to sign the agreement by "choosing marriage over money...." As she essentially related, it was her love for Husband that persuaded her to sign the agreement as well as her desire to marry him as opposed to any " 'wrongful act or threat' " on Hus-

8. "Duress is defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will." *In re Estate of Arbeitman,* 886 S.W.2d 644, 647 (Mo.App.1994) (interpreting Illinois law) (internal quotation omitted). "The modern test for duress is whether the threat has left the individual bereft of the quality of mind essential to the making of a contract." *Id.*

band's part. Under these circumstances, we do not discern Wife was under such a degree of stress or duress that she was left virtually "bereft of the quality of mind essential to the making of a contract." *In re Estate of Arbeitman,* 886 S.W.2d at 647.

▇ Additionally, the record shows Husband "fully disclosed" his financial situation and assets to Wife. *See Miles,* 977 S.W.2d at 301. Courts require full disclosure so as to ensure one party has the ability to make an informed decision about the other party's financial state prior to signing away any rights he or she may have in that property. *McMullin,* 926 S.W.2d at 108.

Here, a list of Husband's assets and debts was attached to the antenuptial agreement along with values for each item and specific descriptions. Wife's assets were also listed. It is our view that there is nothing in the record to suggest that Husband failed to fully disclose his assets to Wife or that Wife was deprived of making a "meaningful decision" regarding her waiver of interest in Husband's property. *Miles,* 977 S.W.2d at 302.

Additionally, in examining "the bargaining positions of each spouse in terms of age, sophistication, education, employment, and experience ..." *Miles,* 977 S.W.2d at 301, we note that at the time of the parties' marriage, Wife was twenty-five years old and Husband was twenty-seven years old. Husband had been married twice before and Wife had one previous marriage. Husband had been a long time employee of Executive Coach Builders and had recently formed the Corporation with Ahart. Wife was employed at Mid America Credit Union as a loan officer and had been in the banking industry for several years.

At the time of the marriage, Husband's assets included his "[o]ne-half interest in [the Corporation]" in the amount of $87,500.00; three vehicles of which two were fully paid; two tracts of real estate; farm equipment and cattle; a savings account; and retirement benefits. He also had several outstanding bank loans. Wife's assets, as reflected on "Exhibit 'B'" of the antenuptial agreement, included $2,000.00 worth of jewelry, some miscellaneous personal property valued at $100.00, and a debt of $2,800.00. Based on the foregoing we cannot say the bargaining power between the parties was so skewered as to make the agreement unconscionable. *See Miles,* 977 S.W.2d at 302 (holding that the parties' bargaining power was similar and the antenuptial agreement was not unconscionable where both parties had high school educations; stated they understood the terms of the agreement; and "each appended property list[s] ..." to the agreement even though husband had no assets).

Lastly, there is little in the record supporting the proposition that Husband misrepresented the reasons for the antenuptial agreement. While Wife argues Husband misrepresented to her that the "only reason for the [ante]nuptial agreement was to protect [Husband's] partnership with [Ahart], in the event [Ahart's] marriage had trouble ...," our review of Wife's testimony, previously set out, reveals otherwise. For example, Wife also testified that Husband told her he and Ahart "would have their wives sign a[n] [ante]nuptial so there wouldn't be any *problems within the marriage* and the partnership because his partner had actually been married, like, four times, *and [Wife] was [Husband's] third [wife].* ..." (Emphasis added). In our view these were legitimate representations made to Wife by Husband as to why he wanted an antenuptial agreement.

Based on the foregoing, we find the trial court abused its discretion in finding "[t]he

circumstances surrounding the presentation and execution of the antenuptial agreement do not indicate the document was entered into freely, fairly, knowingly, understandingly, and in good faith." On the contrary, the record is replete with instances in which Wife herself testified she had knowledge of the terms of the antenuptial agreement; she was represented by counsel; and she willingly signed the agreement.

While we typically do not substitute our judgment for that of the trial court provided there is credible evidence to support the trial court's findings, *see Taylor v. Taylor*, 25 S.W.3d 634, 641 (Mo.App.2000), in the present matter there simply is no credible evidence to support the trial court's ruling that the antenuptial agreement was invalid based on its determination that the agreement was not entered into freely, fairly, knowing and in good faith.

 Next, we must necessarily determine if the antenuptial agreement at issue is unconscionable. *Miles*, 977 S.W.2d at 303. When determining unconscionability we look for the existence of "onesidedness, oppression or unfair surprise." *Ferry*, 586 S.W.2d at 786.

We note that while "unconscionability has been found where, for instance, the agreement attempts to totally take from one of the spouses his or her presumed right to marital property," *Miles*, 977 S.W.2d at 303, that is not the situation presented in the instant matter. Here, the antenuptial agreement did not seek to totally prevent Wife from obtaining the marital assets which she would have been entitled to absent the agreement. While the antenuptial agreement basically provided that the items each spouse brought into the marriage as separate property would remain their separate property, it specifically stated that, if the marriage were

dissolved, the trial court was not precluded "from dividing 'marital property' ..." including "*the increase in value of [Husband's] properties shown on Exhibit 'A', except for [the Corporation]....*" (Emphasis added). Further, the agreement set out that "[a]ll property acquired by the parties after the date of this marriage, in their joint names, shall not be covered by the terms of this agreement and shall be held, managed and disposed of in accordance with the laws then existing, as though this agreement did not exist."

It is our view that the trial court incorrectly found Wife gained nothing by signing the agreement and that "the only thing she gains is having any increase in the value of [Husband's] property by reason of inflation be treated as marital property ... the antenuptial agreement is drafted to completely insulate it from any marital property claim." As already stated, the antenuptial agreement essentially provided that the parties' jointly-titled marital property, except for any interests relating to the Corporation, would be divided per statute as if the antenuptial agreement did not exist, and that both parties waived certain rights to maintenance, inheritance, and attorney fees. Just as importantly, the antenuptial agreement provided Wife would receive an interest in the increased value of the $337,800.00 worth of real estate Husband brought into the marriage. There is nothing unconscionable about such an agreement.

In addition to finding the antenuptial agreement to be unconscionable due to its perceived abrogation of Wife's marital rights, the trial court determined the agreement was unconscionable because, *inter alia*, Wife "worked for [the Corporation] for most of the marriage;" the parties "put all th[eir] money back into the business;" Wife believed the Corporation would be used as their retirement fund;

Wife "thought of [the Corporation] as marital property shared between she and [Husband];" "[Wife] built th[e] business with [Husband];" and "[Wife] made many sacrifices . . . for the sake of the business." Such findings are inappropriate in this setting because it has long been held, and even recognized by the trial court in its judgment, that "the time to measure the conscionability of the antenuptial agreement *is only at the time of execution.*" (Emphasis added). *See Hosmer,* 611 S.W.2d at 35 (holding that "[t]he fairness of the agreement must be determined as of the date of the agreement"). The trial court incorrectly relied on events which occurred *after* the execution of the antenuptial agreement in its determination that the agreement was unconscionable and invalid. *Id.*

▮ Trial courts are required to make findings relating to the fairness and conscionability of antenuptial agreements in order to protect "the unwary and ill-informed spouse." *Ferry,* 586 S.W.2d at 786. However, "[t]here is nothing in the record to indicate that [W]ife was unwary or ill-informed in any way." *Lipic v. Lipic,* 103 S.W.3d 144, 150 (Mo.App.2003).

"While [W]ife may now feel that she entered into an imprudent deal, 'the mere fact that hindsight may indicate the provisions of the agreement were improvident does not render the agreement unconscionable.'" *Id.* (quoting *Heady v. Heady,* 766 S.W.2d 489, 491–92 (Mo.App.1989)).

Here, we find no "strong, gross, and manifest . . ." inequalities such that would render the antenuptial agreement in the present matter unconscionable.[9] *McGilley,* 951 S.W.2d at 637.

The burden of proving the antenuptial agreement was unenforceable was upon Wife. *Id.* Wife, by her own admissions, freely and knowingly entered into the antenuptial agreement at issue, was advised of her legal and other rights, and had knowledge of all of the terms of the agreement. *See Miles,* 977 S.W.2d at 301. Accordingly, there is insubstantial evidence to support the trial court's finding; the trial court's finding is against the weight of the evidence; and it erroneously declares and applies the law, such that we are not required to defer to its judgment.

We now turn to the remaining issues of maintenance and attorney's fees. We agree with Husband that the trial court

9. *See also Miles,* 977 S.W.2d at 303–04 (holding antenuptial agreement was not unconscionable where husband "retained his rights to the accrual of marital property;" the agreement "did not seek to totally prevent [husband] from obtaining the marital assets which he would have obtained absent the agreement;" and where "the agreement basically provided only that what each spouse brought into the marriage as separate property would remain their own separate property"); *Gould v. Rafaeli,* 822 S.W.2d 494, 497 (Mo.App. 1991) (holding antenuptial agreement was not unconscionable where "husband had independent counsel, received the agreement approximately two weeks before the wedding, did not object to any of the terms, and all assets were listed with specific values shown"); *King v. King,* 66 S.W.3d 28, 36 (Mo.App.2001) (holding antenuptial agreement was not unconscionable where although the agreement "provided that the separate property of the parties remain separate, and that provision did result in a great disparity between the separate property set aside to each spouse[,] the agreement, however, did not attempt to preclude an award of marital property to [w]ife"); *Darr v. Darr,* 950 S.W.2d 867, 871 (Mo.App.1997) (holding antenuptial agreement was not unconscionable where it "provided wife with a share of the marital property;" where "wife not only had an opportunity to consult with an attorney, her attorney participated in the negotiations of the final agreement;" where wife "spoke with several friends and expressed her concern about the agreement;" and where "wife's attorney specifically advised wife not to sign the agreement").

also erred in awarding Wife maintenance and attorney's fees.

█ Regarding the issue of maintenance, this Court has long approved of provisions within antenuptial agreements which purport to waive maintenance claims. *See McGilley,* 951 S.W.2d at 640. Further, when such a provision "purports to inhibit remedies provided by statute, it should be rather strictly construed." *B.J.D. v. L.A.D.,* 23 S.W.3d 793, 800 (Mo. App.2000).

In the present matter, having invalidated the antenuptial agreement, the trial court awarded Wife periodic maintenance, per section 452.335, in the amount of $12,178.00 per month. However, the record reveals that in addition to the fact that Wife not only testified she knew when she signed the antenuptial agreement that *she was waiving her rights to maintenance,* the provision in the antenuptial agreement clearly and unambiguously waives such a right. The antenuptial agreement specifically states that "[i]f the parties' marriage is legally terminated ... neither shall be entitled to any alimony, maintenance, support money ... or any other money by virtue thereof." "The [antenuptial] agreement is clear and unambiguous in stating that the parties waive their right to maintenance." *McGilley,* 951 S.W.2d at 640. Accordingly, having already found the trial court erred in invalidating the antenuptial agreement, this Court also reverses the trial court's judgment awarding maintenance to Wife.

█ As a general rule we do not disturb a trial court's decision to award attorney's fees absent an abuse of discretion. *In re Marriage of Lindeman,* 140 S.W.3d 266, 279 (Mo.App.2004). "However, when a party requests attorney fees under a provision of a contract, the trial court must comply with the terms set forth in that contract." *Kester,* 108 S.W.3d at 225. "This requirement applies to attorney fees provisions in antenuptial agreements." *Id.* Here, the antenuptial agreement specifically sets out that "neither [party] shall be entitled to ... attorney fees ..." upon dissolution of their marriage. Accordingly, we find the trial court erred in awarding attorney's fees to Wife and the award of attorney's fees is reversed. Points I, II, and III have merit.

█ Husband's fourth point on appeal asserts the trial court's judgment that the stock in the Corporation was "transmuted" into marital property and that "[Husband's] separate interest in the stock is worth $87,500[.00] ..." was unsupported by substantial evidence and was contrary to established law. Specifically, Husband alleges there was no evidence presented regarding any increase in the value of the Corporation's stock during the parties' marriage; the trial court's finding that Wife "put her separate assets at risk contradicts its finding that [Wife] had no separate assets;" and the trial court erroneously relied upon Wife's "Exhibit 5c," an accountant's report, where that exhibit was never admitted into evidence.[10] Additionally, Husband asserts the trial court's finding was contrary to law in that it relied on the case of *Fritz v. Fritz,* an unpublished 1989 Eastern District appellate decision, in finding Wife's "personal guarantees of [the Corporation] 'transmuted' the

---

10. Our review of the record reveals Husband is correct in his assertion that "Exhibit No. 5C," a report by accountant Elmer Selim, was never entered into evidence at the trial in this matter; however, there is nothing in the record which shows the trial court relied on this particular exhibit. In either event, the transcript reveals the parties stipulated to the generalized contents of this report. Accordingly, we find no merit in this portion of Husband's argument and we dispose of it at the outset.

stock into marital property, even though no marital funds were used to repay the loans and [Wife] admitted that she and [Husband] were both adequately compensated for the services that they provided to [the Corporation]."

In its judgment, the trial court found alternatively that "[e]ven if the antenuptial agreement is enforceable, [Husband] has nullified its effect by transmuting [the Corporation] to a marital asset." [11] In support of its finding of transmutation, the trial court detailed the fact that Husband listed the Corporation on the parties' joint financial statements; Husband "included [Wife] when guarantees for business loans were needed;" Husband repeatedly told Wife throughout their marriage the Corporation "was [theirs] to share;" Husband assured Wife on numerous occasions he had no intention of ever enforcing the antenuptial agreement; and Husband referred to a shareholder loan made to the Corporation as being "owed jointly," although Wife was not a shareholder. Accordingly, the trial court set aside to Husband, as his separate property, the previously mentioned stock in the Corporation valued at $87,500.00, which was the value of the stock when the parties were married, as reflected in the antenuptial agreement.

■■■ Generally, property is nonmarital if a spouse owned it before the marriage and retained separate title to it after marriage. *Glenn v. Glenn,* 930 S.W.2d 519, 523 (Mo.App.1996). Transmutation occurs "[w]here the parties continually commingle marital assets and earnings, and treat property as communal...." *Cuda v. Cuda,* 906 S.W.2d 757, 759 (Mo. App.1995). With that being said, "trans-

mutation ... allows a spouse to transmute a piece of separate property to marital property...." *Williams v. Williams,* 965 S.W.2d 451, 454 (Mo.App.1998). However, "[n]on-marital property does not become marital property 'solely because it may have become commingled with marital property,'...." *D.K.H. v. L.R.G.,* 102 S.W.3d 93, 100 (Mo.App.2003) (quoting § 452.330.4). Rather, the owner's intent to convert the property to marital property is the determining factor. *Kinsey–Geujen v. Geujen,* 984 S.W.2d 577, 579 (Mo. App.1999); *see also Ker v. Ker,* 776 S.W.2d 873, 877 (Mo.App.1989) (holding that "[n]on[-]marital property may lose its character as such if there is evidence of an intention to contribute the property to the community").

■■■ In our analysis, we begin with the trial court's finding that Wife's "contribution to [the Corporation] in terms of guaranteeing necessary funds establishe[d] conversion to marital property." However, the use of marital property to secure financing for one spouse's separately held corporation is not sufficient to render the Corporation's stock marital property where no marital funds were invested in the corporation and only corporate funds were used to pay off the debt. *See Signaigo v. Signaigo,* 718 S.W.2d 647, 648 (Mo. App.1986) (holding that wife's contribution to the company as a seventeen-year paid employee and the fact that she secured a loan of $75,000.00 for the company by encumbering her separate property was not sufficient to transmute the status of the company from separate to marital property, where neither wife's personal funds nor marital funds were ever actually invested in the corporation); *see also Klaus v.*

11. Observing that the parties had stipulated the Corporation was valued at $2,500,000.00, the trial court subtracted from that value the $87,500.00 set aside to Husband as his separate property, added in a $78,125.00 federal tax credit as well as a $9,256.00 state tax credit, and arrived at a value for the Corporation in the amount of $2,499,988.00, which was awarded to Husband in the trial court's division of marital property.

*Klaus,* 918 S.W.2d 407, 409 (Mo.App.1996) (holding that "[t]he claim for non-marital property was rejected because marital funds had been used solely as security and were not expended to repay any loan owed by the separately held corporation").

Here, while it is clear that on several occasions Husband and Wife used their marital property as security to guarantee loans to the Corporation from various banking establishments, there is little or nothing in the record to show marital funds were expended to repay the loans or marital funds were used to fund the Corporation. As previously related, the mere fact that marital property was pledged as security for loans to the Corporation is not sufficient by itself to transmute the Corporation's stock into marital property.[12] *Signaigo,* 718 S.W.2d at 648.

Further, the fact that the parties' joint income tax returns reflect income, expenses, and interest relating to the Corporation also does not illustrate an intention to transmute Husband's interest in the Corporation into marital property. During the majority of the parties' marriage, the Corporation was an S–Corporation and "[a]n S corporation's income and losses pass through to stockholders for tax purposes." *D'Arcy and Assocs., Inc. v. K.P.M.G. Peat Marwick, L.L.P.,* 129 S.W.3d 25, 32 (Mo.App.2004); *see also* § 143.471. It only follows that such income and interest would appear on the parties' tax returns because Husband is the sole shareholder of the Corporation.

Further, the shareholder loans taken out by Husband also show no intent to transmute the Corporation's stock into marital property. Husband testified he often obtained funds from the Corporation via "a note to the [C]orporation as a shareholder loan." Husband stated the money from the shareholder loans was used "[t]o purchase various things ... [for example, when] [Wife] and [Husband] built the house that [he] currently reside[s] in, [for] livestock, improvements on the farm, for the Tennessee Walking horses, et cetera, basically things that—that [they] deemed that [they] ..." needed. Husband stated he was the only person able to execute these shareholder loans because *he* was the only shareholder of the Corporation. It is undisputed that Wife is not a shareholder in the Corporation, as admitted by Wife. The fact that Husband took shareholder loans from the Corporation in order to benefit the parties is not evidence of his intent to treat the Corporate stock as communal.

Likewise, the joint personal financial statements filed by the parties in this matter do not show an intention to transmute Husband's interest in the Corporation. Six joint financial statements were entered into evidence. Our examination reveals that four of the six financial statements clearly set out under the respective "Individual" columns Husband's interest in the Corporation, while there are no notations under either the "Joint" columns or the "If joint, with whom" columns of the financial statements. Only one joint financial statement lists the Corporation under its "Joint" column. The remaining joint financial statement does not even have a "Joint" column designation. Accordingly, the bulk of the joint financial statements submitted into evidence specifically set out that the Corporation *is Husband's* "Individual" property. As such the joint financial statements were not, as found by the

---

**12.** The trial court's reliance on *Fritz v. Fritz,* No. 54246, slip op. 2–3 (Mo.App.E.D. January 10, 1989) does not assist Wife because as an unpublished opinion under Rule 84.16, the opinion "shall not constitute a formal opinion of the court, shall not be reported, and shall not be cited or otherwise used in any case before any court."

All rule references are to Missouri Court Rules (2005).

trial court, documents which "show[ed] . . . [the Corporation] was a joint venture between [Husband] and [Wife]." On the contrary, the majority of these joint financial statements are evidence of Husband's intent to keep the Corporation as his *separate* property.

Based on the foregoing, there is little or no evidence in the record supporting the proposition that the parties continually commingled their marital assets with those of the Corporation such that the Corporation's stock was transmuted into marital property. *Klaus v. Klaus,* 918 S.W.2d at 409–10. Point IV is granted.

Husband's fifth point relied on asserts that even if the trial court properly found the antenuptial agreement was invalid, the trial court abused its discretion in awarding maintenance to Wife in the amount of $12,178.00 per month. Based on our finding relating to the antenuptial agreement and our finding relating to maintenance we do not address Husband's fifth point relied on, because the matter is now made moot by our determination.

Husband's sixth point relied on contends the trial court erred in declaring both the federal and state tax credits of the Corporation to be marital property because the parties stipulated the Corporation was valued at $2,500,000.00 and "there was no evidence that the tax credits were not part of that value."

The record reveals that for the tax year of 2001 the Corporation was entitled to a federal tax credit of $78,125.00 and a state tax credit of $9,256.00 for "research and development. . . ." The parties stipulated the value of the Corporation was $2,500,000.00.

At trial on November 19–20, 2003, and January 16, 2004, Husband testified that both tax credits are the property of the Corporation and not the marital property of the parties. Wife offered no evidence at trial relating to the tax credits.

Nevertheless, in its judgment, the trial court found the tax credits to be marital property. We agree with Husband that there is no evidence in the record to support the trial court's finding relating to the tax credits, *see Rivers,* 21 S.W.3d at 121, particularly in light of our determination that the Corporation is the separate property of Husband under the terms of the antenuptial agreement. The trial court erred in finding the Corporation's tax credits were marital property. Point VI has merit.

In his seventh and final point on appeal, Husband contends the trial court erred in awarding certain property belonging to the Corporation to Wife. Specifically, Husband takes issue with the award to Wife of $43,195.00 worth of equipment, including a "2000 Ford Extended F–150, 1998 Softtouch Trailer, and Kubota Tractor." Husband argues this award to Wife was in error because the Corporation is not a party to the dissolution proceedings, thus, the trial court had no jurisdiction to distribute that property. He further asserts the evidence does not support such an award because the parties agreed the value of the Corporation was $2,500,000.00 and removing property from it would decrease its value.

"In a dissolution decree, a court *may not* exercise control over property belonging to a corporation, even if one of the spouses is the sole shareholder of that corporation." *Comninellis v. Comninellis,* 99 S.W.3d 502, 512 (Mo.App.2003) (emphasis added). "Courts in Missouri recognize an exception to this rule when the corporation is a party to the action." *Id.; see also In re Marriage of Ward,* 659 S.W.2d 605, 607 (Mo.App.1983).

Here, the Corporation is not a party to this matter and this property was titled and owned by the Corporation not the parties. Therefore, the trial court exceeded its jurisdiction in dividing and disposing

of the three assets of the Corporation listed above. Point VII has merit.

Accordingly, this Court reverses the trial court's judgment determining the antenuptial agreement was void, invalid, unenforceable and unconscionable, as well as the trial court's alternative determination that Husband transmuted his stock in the Corporation into marital property. This Court also reverses the trial court's award of maintenance, attorney's fees and property owned by the corporation to Wife, and reverses the trial court's determination that the Corporation's federal and state tax credits were marital property. We remand the matter to the trial court for further proceedings consistent with this opinion and for its reconsideration of its division of marital property.

SHRUM, P.J., and GARRISON, J., concur.